# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**CARLA DeYOUNG, ET AL.**                              **CIVIL ACTION NO.**

**VERSUS**                                                        **25-1-SDD-EWD**

**GREATER BATON ROUGE ASSOCIATION**
**OF REALTORS, INC., ET AL.**

## NOTICE

      Please take notice that the attached Magistrate Judge's Report and Recommendation has been filed with the Clerk of the U.S. District Court.

      In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein.  Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

      ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

      Signed in Baton Rouge, Louisiana, on March 6, 2026.


                                  **ERIN WILDER-DOOMES**
                                  **UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **CARLA DeYOUNG, ET AL.** | **CIVIL ACTION NO.** |
| **VERSUS** | **25-1-SDD-EWD** |
| **GREATER BATON ROUGE ASSOCIATION OF REALTORS, INC., ET AL.** | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Defendants' Motion to Dismiss the Amended Complaint for Failure to State a Claim ("the Motion"),[1] filed by Greater Baton Rouge Association of REALTORS®, Inc.; New Orleans Metropolitan Association of REALTORS®, Inc.; Bayou Board of REALTORS®, Inc.; Greater Central Louisiana REALTORS® Association, Inc.; REALTOR® Association of Acadiana; Louisiana REALTORS® ("LR"); Roam MLS, LLC ("Roam MLS"); National Association of REALTORS® ("NAR");[2] and Kenneth Damann[3] (together "Defendants"). The Motion is opposed by Carlos Alvarez, Tammy Jo Williams, Carla DeYoung, and Darlene Currie (together "Plaintiffs").[4]  Because Plaintiffs fail to state a federal claim upon which relief can be granted, it is recommended that the Motion be granted in part and that

---

[1] R. Doc. 41 and *see* R. Doc. 43 (Reply Memorandum). Documents in the Court record are referred to as "R. Doc. __." Defendants also filed two Motions for Leave to File Notice of Supplemental Authority informing the Court of cases ruled on after the Motion was filed. *See* R. Docs. 47, 49. The Court granted the Motions. R. Docs. 51, 52, 53. Plaintiffs opposed both Defendants' Motions for Leave to File Notice of Supplemental Authority. *See* R. Docs. 48, 50. This Report considers Plaintiffs' substantive arguments raised in these oppositions.

[2] Defendants claim that Plaintiffs incorrectly name "Louisiana Realtors Association" as a defendant in the Amended Complaint, while this Defendant's proper name is Louisiana REALTORS®. *See* R. Doc. 41, p. 1, n.1. Plaintiffs moved to correct this Defendant's name in the case caption, which was granted by the Court. R. Doc. 60.

[3] Defendants claim that Plaintiffs incorrectly name "Kenneth Daman" as a defendant in the Amended Complaint, while this Defendant's proper name is Kenneth Damann. *See* R. Doc. 41, p. 1, n.2. Plaintiffs moved to correct this Defendant's name in the case caption, which was granted by the Court. R. Doc. 60.

[4] R. Doc. 42 and *see* R. Doc. 46 (Sur-Reply). Plaintiffs also filed Motion for Leave to File Supplemental Authority. R. Doc. 54. The Court denied Plaintiff's Motion for Leave to File Supplemental Authority as the information it sought to have the Court consider was factual information and argument not properly considered supplemental authority. R. Doc. 60.

Plaintiffs' Clayton Act claim (15 U.S.C. § 14) and Section 2, Sherman Act claim (15 U.S.C. § 2) be dismissed with prejudice; Plaintiffs' claims against Kenneth Damann be dismissed without prejudice; Plaintiffs' remaining federal claims be dismissed without prejudice; Plaintiffs be given twenty-one (21) days to file an amended complaint as to their remaining federal claims; and evaluation of Plaintiffs' state law claims be deferred.

## I.     BACKGROUND

Plaintiffs, who are representing themselves,[5] filed this lawsuit as real estate agents, brokers, and/or residential appraisers who earn their living by marketing and selling "real property."[6] Plaintiffs allege in their original and amended complaints that Defendants have engaged in anti-competitive practices, including unlawful tying arrangements that compel Plaintiffs to join the NAR, LR, and a local real estate association as a condition for accessing Multiple Listing Service ("MLS") data,[7] which violate, among other things, the Sherman Act, 15 U.S.C. §§ 1-2; the Clayton Act, 15 U.S.C. § 14; and the Fair Housing Act.[8]

Plaintiffs' Amended Complaint, filed after Defendants filed their first Motion to Dismiss,[9] adds claims under the Louisiana Monopolies Act, further allegations of civil conspiracy, and First Amendment freedom of association claims.[10] The Amended Complaint removes Plaintiffs' claim

---

[5] *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019) ("The filings of a pro se litigant are 'to be liberally construed,' ... and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]' " (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (other citation omitted)). That said, "[w]hile a pro se complaint should be construed liberally, it can be dismissed for failure to state a claim if 'the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Germalic v. Schedler*, No. 08-689, 2011 WL 3235654, at *1 (M.D. La. July 28, 2011) (citations omitted).

[6] *See* R. Docs. 1, 38.

[7] As noted by Defendants, one court described an MLS as "a computerized database of homes for sale" in a particular area. *See* R. Doc. 41-1, pp. 9-10, citing *Buyer's Corner Realty, Inc. v. N. Ky. Ass'n of Realtors*, 410 F.Supp.2d 574, 576 (E.D. Ky. 2006, aff'd, 198 Fed.Appx. 485 (6th Cir. 2006).

[8] R. Doc. 1, ¶ 7, ¶¶ 30-43; R. Doc. 38 at ¶ 7, ¶¶ 30-49.

[9] *See* R. Doc. 29. Plaintiffs opposed Defendants' first Motion to Dismiss. R. Doc. 30.

[10] R. Docs. 33, 33-1, 37, 38.

that Defendants violated the Federal Trade Commission Act ("FTC").[11] Defendants' First Motion to Dismiss was terminated pursuant to Local Civil Rule 12 when Plaintiffs were granted leave to file the Amended Complaint.[12] In response to the Amended Complaint, Defendants filed the Motion, seeking to dismiss all Plaintiffs' claims against all Defendants. Plaintiffs allege that Defendants enforce the policies at issue, so all claims against all Defendants will be considered together.[13]

## II.   LAW AND ANALYSIS

### A.  Standard for Fed. R. Civ. P. 12(b)(6)[14]

In *Bell Atlantic Corp. v. Twombly*,[15] and *Ashcroft v. Iqbal*,[16] the Supreme Court clarified the standard of pleading that a plaintiff must meet to survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level."[17] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[18] "A claim has facial plausibility when the plaintiff pleads factual content that allows

---

[11] The introduction of the Amended Complaint continues to list the Federal Trade Commission Act claim, but that claim is stricken in the body of the pleading. *See* R. Doc. 38, pp. 1, 10.

[12] *See* R. Doc. 37.

[13] Though Plaintiffs allege that Roam MLS access is contingent on membership in various associations, Plaintiffs seem to lump their claims against Roam MLS in with the associations. *See* R. Doc. 38, ¶ 7. According to Defendants, Roam MLS is owned by The Greater Baton Rouge Association of REALTORS®, Inc., New Orleans Metropolitan Association of REALTORS®, Inc., Bayou Board of REALTORS®, Inc., Greater Central Louisiana REALTORS® Association, Inc., and the REALTOR® Association of Acadiana (the "Local Associations"). R. Doc. 41-1, p. 9. This Report considers all Plaintiffs' claims together.

[14] Plaintiffs, in opposition to the Motion to Dismiss, improperly rely on Louisiana's legal standards for an "exception of no cause of action." *See* R. Doc. 42, p. 7. The correct standard applied in this Court is outlined below.

[15] 550 U.S. 544 (2007).

[16] 556 U.S. 662 (2009).

[17] *Twombly*, 550 U.S. at 555.

[18] *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. 544.

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[19] It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' "[20] "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[21]

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint."[22] Moreover, the federal pleading rules simply require a "short and plain statement of the claim showing that the pleader is entitled to relief."[23] Notwithstanding, the court need not accept "a legal conclusion couched as a factual allegation,"[24] or "naked assertions [of unlawful conduct] devoid of further factual enhancement."[25] Additionally, this Report does not consider the exhibits attached to Plaintiffs' opposition memorandum because these documents are not attached to the Amended Complaint.[26] Though the Court may consider documents attached to a motion to dismiss or an opposition when

---

[19] *Id.*

[20]  *Id.* at 679.

[21] *Id.* at 678 (internal quotation omitted).

[22] *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[23] Fed. R. Civ. P. 8(a)(2).

[24] *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

[25] *Iqbal*, 556 U.S. at 678 (internal quotation omitted).

[26] *Brackens v. Stericycle, Inc.*, 829 Fed.Appx. 17, 23 (5th Cir. 2020) ("Here, the district court relied on our decision in *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000), to strike the exhibits because they were not part of the pleadings or its attachments. Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014), the court need not do so. We conclude the district court did not abuse its discretion in excluding the exhibits, even though some were referenced in Brackens's pleading. *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference)").

the documents are referred to in the pleadings and are central to Plaintiffs' claims, the Court need not do so.[27] As discussed below, however, if this Report is adopted and Plaintiffs choose to amend their complaint, they should focus their efforts on ensuring that the body of the complaint contains the facts necessary to support their claims.

### B.  Plaintiffs Fail to State a Claim Against Defendant Kenneth Damann

Defendants argue that the Amended Complaint is deficient as to Plaintiffs' claims against Kenneth Damann because it "does not contain a single allegation about Mr. Damann's role in the alleged conduct."[28] In opposition, Plaintiffs argue that Damann's "dual roles with GBRAR and Roam MLS are central to our antitrust claims, as they directly relate to the enforcement of the contested membership rules tying MLS access to association membership. His influence is documented in communications with the plaintiffs, underscoring the need for further discovery into his involvement and any potential collusion with NAR and LR. Therefore, Mr. Damann's actions are crucial to our case, the motion to dismiss him should be denied."[29]

Plaintiffs name Damann, registered agent for Roam MLS and Executive Vice President of Defendant Greater Baton Rouge Association of Realtors, Inc., as a defendant in this matter.[30] Despite Plaintiffs' arguments in their opposition memorandum, the Amended Complaint contains no factual allegations against Damann other than naming him in the case caption and in the list of defendants. The Amended Complaint does not specifically identify any action or inaction

---

[27] Leaving aside whether it is properly considered, much of the information contained in the exhibits attached to Plaintiffs' opposition was also available to Plaintiffs at the time the original complaint was filed in January 2025. *See* R. Docs. 42-3 (article dated November 25, 2024), 42-7 through 42-10 (articles dated before suit filed); 42-12 through 42-13 (articles dated before suit filed); 42-17 (minutes of August 15, 2024 Louisiana Real Estate Commission Meeting).

[28] R. Doc. 41-1, p. 17.

[29] R. Doc. 42, p. 9.

[30] R. Doc. 38, p. 3.

attributed to him. Plaintiffs, therefore, fail to state claim against Damann upon which relief can be granted because the Amended Complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[31] "A 'court is not required to search for or try to create causes of actions or find material issues of fact for pro se plaintiffs.'"[32] Because the Amended Complaint fails to allege any facts to support a claim against Damann, the claims against Damann should be dismissed; however, because Plaintiffs state in their opposition memorandum that they had specific communications with Damann that relate to the claims at issue, Plaintiffs should be given leave to amend as to this claim.

### C. Plaintiffs Fail to State an Antitrust Claim under the Clayton Act (Count I)

Defendants argue that Plaintiffs' tying claim under the Clayton Act fails as a matter of law because neither association membership nor MLS access are goods or other commodities as required to state a claim under Section 3 of the Clayton Act.[33] Plaintiffs respond that the Clayton Act can apply to essential facility cases, which Plaintiff say has been invoked in various cases to address situations where a monopolist controls a facility that is essential for competitors to compete effectively.[34]

Section 3 of the Clayton Act makes it unlawful to enter tying arrangements, whereby goods are sold on the condition or understanding that the purchaser will not use or deal in the goods of a competitor of the seller, where the effect may be to lessen competition or to tend to create a

---

[31] *Iqbal*, 556 U.S. at 678.

[32] *In re Wood*, No. 23-53, 2025 WL 1606199, at *3 (M.D. La. Mar. 28, 2025), report and recommendation adopted, No. 23-53, 2025 WL 1787422 (M.D. La. June 27, 2025) (Dick, C.J.) (citation omitted).

[33] R. Doc. 41-1, pp. 12-13.

[34] R. Doc. 42, pp. 14-15, citing *In re Air Passenger Computer Reservations Sys. Antitrust Lit.,* 694 F.Supp. 1443 (C.D. Cal. 1988).

monopoly.[35] Plaintiffs assert that Defendants allegedly "compel membership in REALTOR®

organizations as a condition for accessing MLS (Multiple Listing Service) data."[36] A Clayton Act

violation applies to the sale or lease of "goods, wares, merchandise, machinery, supplies, or other

commodities."[37] Because the MLS is a service, it does not fit within the scope of Section 3 of the

Clayton Act.[38]

"The Clayton Act requires that both the tying and the tied products be goods…"[39] As

Plaintiffs allege that Defendants are tying access to the Roam MLS, a service, to mandatory

membership in the realtor organizations, Plaintiffs cannot state a claim upon which relief can be

granted under § 3 of the Clayton Act, which, by its express terms, does not apply to services. Since

Plaintiffs cannot cure this deficiency, further leave to amend should not be permitted and Plaintiffs

Clayton Act claim should be dismissed with prejudice.[40]

---

[35] 15 U.S.C. § 14; *see also Eytalis v. Nat'l Ass'n of Realtors*, No. 24-147, 2025 WL 2054094, at *3 (N.D. Tex. June 9, 2025), report and recommendation adopted, No. 24-147, 2025 WL 2053096 (N.D. Tex. July 22, 2025).

[36] R. Doc. 38, ¶ 2.

[37] 15 U.S.C. § 14.

[38] *See Eytalis* 2025 WL 2054094, at *3 (dismissing the plaintiff's Clayton Act claims where the plaintiff was required to retain membership in realtor associations to access multiple listing services), citing *Pope v. Miss. Real Estate Com.*, 872 F.2d 127, 130 (5th Cir. 1989) (referring to an MLS as a service). *See also Battle v. Liberty Nat. Life Ins. Co.,* 493 F.2d 39, 46 (5th Cir. 1974) ("[p]rice fixing under § 3 is limited by the statute's language to transactions dealing in 'goods, wares, merchandise, machinery, supplies, or other commodities' and therefore does not apply to services. The price-fixing of services would be covered by § 1 of the Sherman Act."); *Centanni v. T. Smith & Son, Inc.*, 216 F.Supp. 330, 339 (E.D. La. 1963) (finding the Clayton Act did not apply to claims because only services, not the sale or lease of products, were involved); *Chawla v. Shell Oil Co.*, 75 F.Supp.2d 626, 644 (S.D. Tex. 1999) ("Clayton Act § 3 applies only when both the tying and tied products are goods. *See Marts v. Xerox*, 77 F.3d 1109, 1113 n. 6 (8th Cir. 1996); *Crossland v. Canteen Corp.*, 711 F.2d 714, 719 n. 1 (5th Cir. 1983). Tying arrangements that involve services are not governed by § 3. *See Advance Business Sys. and Supply Co. v. SCM Corp.*, 415 F.2d 55, 61 (4th Cir. 1969)."). While Plaintiff argues the Wikipedia definition of an MLS defines it as a product and that a service is also a type of product (R. Doc. 48-1, pp. 6-7), this argument is not persuasive in light of the plain language of the Clayton Act and the fact that a service has been distinguished from the list of items covered under the Clayton Act by courts in this Circuit.

[39] *Crossland*, 711 F.2d at 718 n. 1, citing 15 U.S.C. § 14 (1976); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048–49 n. 5 (5th Cir. 1982), cert. denied, 459 U.S. 1105, (1983); *Advance Business Sys. & Supply Co.*, 415 F.2d at 64 (4th Cir. 1969).

[40] The case upon which Plaintiffs rely in opposition, *In re Air Passenger Computer Reservations Sys. Antitrust Lit.,* 694 F.Supp. 1443, does not relate to Section 3 claims under the Clayton Act, but instead involved claims under Section 2 of the Sherman Act. *Id*. at 1449.

**D.  Plaintiffs Fail to State an Antitrust Claim under the Sherman Act (Count VIII)**

"The Sherman Act makes every contract, combination, or conspiracy in unreasonable restraint of the interstate or foreign commerce illegal."[41]  Section 2 of the Sherman Act also makes any act, attempt, or conspiracy of monopolization illegal.[42]  Before applying the act, the Court "must establish whether plaintiff had standing to maintain this claim under the Sherman Act. The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint."[43] Section 4 of the Clayton Act, 15 U.S.C. § 15, enables a private citizen to bring a suit to enforce the Sherman Act.[44] An antitrust plaintiff, therefore, must have standing under Section 4 of the Clayton Act to bring a Sherman Act claim.[45]

**1.  Plaintiffs Fail to Sufficiently Plead an Antitrust Injury to Establish Standing**

In order to bring a claim under Section 4 of the Clayton Act for violation of Section 1 or Section 2 of the Sherman Act, Plaintiffs must show not only injury "to the plaintiff's business or property resulting from the alleged violation, but also a showing of antitrust injury and standing."[46] The elements of antitrust standing are: "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit."[47] To determine proper plaintiff status, courts consider: (1) whether the plaintiff's injuries or their causal link to the defendant are speculative,

---

[41] *Hartford Fire Ins., Co. v. California*, 509 U.S. 764, 769 (1993), citing 15 U.S.C. § 1.

[42] *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Stewart Glass & Mirror v. Auto Disc. Ctrs. Inc.*, 200 F.3d 307, 316 (5th Cir. 2000).

[43] *Transource Int'l, Inc. v. Trinity Indust., Inc.*, 725 F.2d 274, 280 (5th Cir. 1984) (internal quotation marks omitted).

[44] *Ancar v. Sara Plasma, Inc.*, 964 F.2d 465, 468 (5th Cir. 1992); *Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 313 (5th Cir. 1985).

[45] *Id.*

[46] *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007) (citations omitted).

[47] *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997).

8

(2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment.[48]

"The [Supreme] Court, observing that the antitrust laws… were enacted for the protection of competition not competitors, went on to state that a plaintiff must prove more than injury causally linked to an antitrust violation…."[49] "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."[50] "'This circuit has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition.' … 'Loss from competition itself—that is, loss in the form of customers' choosing the competitor's goods and services over the plaintiff's—does not constitute an antitrust injury.' … In short, the question underlying antitrust injury is whether *consumers*—not *competitors*—have been harmed."[51]

Defendants allege that Plaintiffs have not properly pleaded antitrust injury because they fail to adequately plead injury to competition.[52] According to Defendants, Plaintiffs make only conclusory statements that "the market is hindered, leading to fewer options for consumers and negatively affecting overall market dynamics.[53] In response, Plaintiffs stated,

> The Plaintiffs submit that they have indeed suffered antitrust injury as required for standing, with injuries stemming directly from the Defendants' anticompetitive conduct. These injuries are not merely speculative but are concrete and

---

[48] *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988).

[49] *See id.* (internal quotations omitted), quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

[50] *Id.*

[51] *Rx Sols., Inc. v. Caremark, L.L.C.*, 164 F.4th 436, 444 (5th Cir. 2026) (emphasis in original; citations omitted).

[52] R. Doc. 41-1, p. 14.

[53] *Id.*, citing R. Doc. 38, ¶ 15.

multifaceted, manifesting as reputational damage, loss of essential data, emotional distress, and loss of income. Such injuries are the very harm the antitrust laws intend to prevent, as they result from Defendants' actions that restrict competition and harm participants in the marketplace. The Plaintiffs have gone beyond making conclusory statements; they have provided specific factual allegations demonstrating how the Defendants' conduct has hindered the market. This conduct has led to fewer consumer options and negatively affected market dynamics, thus establishing harm to competition. Moreover, the Plaintiffs have detailed how Defendants' tying arrangements have not only forced them to purchase unwanted products but also resulted in broader anticompetitive effects within the relevant market. These allegations are supported by more than just the theoretical underpinnings of antitrust law; they are grounded in actual detriment to the Plaintiffs' business operations and market standing. Therefore, the Plaintiffs contend that they have sufficiently pled facts that, when taken as true, establish antitrust injury, satisfying the threshold for antitrust standing to bring claims under sections 1 and 2 of the Sherman Act.[54]

Plaintiffs, four individuals, detail their own injuries[55] arising from Defendants' rules mandating membership in Defendants' organizations to access Roam MLS. However, Plaintiffs do not sufficiently connect these injuries to a negative impact on consumers in the market as opposed to injury to themselves.[56]

Merely being forced to purchase an unwanted product does not establish antitrust injury, or, therefore, antitrust standing.[57] Plaintiffs' argument that being forced to purchase association

---

[54] R. Doc. 42, p. 17.

[55] Injury-in-fact to a plaintiff caused by the defendant's conduct is also a requirement to bring an antitrust claim. *Doctor's Hosp. of Jefferson, Inc.*, 123 F.3d at 305. It is important to note that Plaintiffs state, "Some plaintiffs are current members of Roam MLS, while others canceled their memberships due to concerns regarding potential violations of the law. Roam MLS, is serviced by a third-party platform, Paragon MLS." *See* R. Doc. 38, ¶ 7. Therefore, it is unclear what injury-in-fact Plaintiffs who are still members with access to the MLS have suffered. Plaintiffs should be sure to detail their specific injuries as well as the injuries consumers are suffering and why in any amended complaint.

[56] *See Eytalis*, 2025 WL 2054094, at *5 (holding that Plaintiff, who suffered injuries arising from defendant's rules concerning non-member annual dues for agents and requirements that she pay dues for inactive agents or no longer serve as their sponsoring broker, did not plead antitrust injury because her allegations only plead individual injury and not harm to competition). Though *Eytalis* was only one plaintiff and here there are four, the same principle stands— Plaintiffs plead individual injures harming their practice and do not provide sufficient examples of consumer injury. Vague references to the fact that certain rules harm consumers is insufficient. Plaintiffs must explain how the alleged tying arrangement at issue, which is the conduct about which they complain, harms consumers.

[57] *Findling v. Realcomp II, Ltd.*, No. 17-11255, 2018 WL 1425952, at *3 (E.D. Mich. Mar. 22, 2018), citing *Buyer's Corner Realty, Inc. v. N. Ky. Ass'n of Realtors*, 410 F. Supp. 2d 574, 580 (E.D. Ky.), aff'd sub nom., *Buyer's Corner Realty, Inc. v. N. Ky. Ass'n of Realtors, Inc.*, 198 Fed.Appx. 485 (6th Cir. 2006).

memberships in order to access Roam MLS is antitrust injury is not persuasive because (1) Roam

MLS is merely a place to list real estate and even Plaintiffs' Amended Complaint recognizes that

the MLS can lower costs associated with real estate which could benefit consumers;[58] (2) Plaintiffs

do not adequately allege harm, outside of harm to themselves;[59] and (3) Plaintiffs do not adequately

explain in the Amended Complaint how the rules of the associations have an anticompetitive effect

on consumers. Plaintiffs state that the "Participation Rule" and the "Clear Cooperation Policy" are

other policies that NAR enforces that "have irreparably harmed the reputation of the entire real

estate industry," but fail to provide facts in the Amended Complaint to explain what these policies

require or how these rules have caused any anticompetitive harm.[60] Additionally,  Plaintiffs state

their individual injuries with specificity in their opposition memorandum, but continually fail to

allege factual support for *antitrust* injury.[61]

---

[58] R. Doc. 38, ¶ 18.

[59] R. Doc. 38, ¶ 12 (Plaintiffs state that they are forced to purchase membership in Defendants' organizations as a prerequisite to access Roam MLS, which is, according to Plaintiffs, "a critical facility in the real estate industry" and further stating that "without access to the MLS that serves the specific market area needed, real estate professionals face significant disadvantages in competing effectively." They further state "the data provided by the market area MLS is unparalleled and unavailable on any other platform that could offer comparable competitive opportunities.").

[60] R. Doc. 38, ¶¶ 11, 19. Plaintiffs' Amended Complaint does not plausibly allege how these policies violate any antitrust laws because it fails to adequately describe what these policies are or what effects on consumers they have. Plaintiffs reference other policies in their opposition memorandum like buyer-broker agreements and the removal of seller or broker offered compensation information to buyers' agents from the MLS listings (R. Doc. 42, pp. 10-12), but these policies are not referenced in the Amended Complaint.

[61] R Doc. 42, p. 19 ("The defendant's exclusionary tactics have denied them access to this critical data, and for those that can not withdraw membership puts them in jeopardy of violating laws by abiding by the rules enforced by the associations. As a direct result of the defendant's conduct, *the plaintiffs have suffered an actual and concrete injury*, namely the inability to access the essential data needed to conduct their business. *This injury has placed the plaintiffs at a competitive disadvantage, directly impeding their ability to generate business and causing them economic harm*. This harm is neither hypothetical nor speculative; it is ongoing and impacts the plaintiffs' daily operations."), but *see* p. 20 ("The plaintiffs contend that the *defendant's actions have impeded their ability to serve their clients effectively*, resulting in fewer options for consumers and adverse impacts on overall market dynamics. This is not a mere conclusory statement; it is a reflection of the tangible and detrimental effects that arise when independent contractors are unjustly barred from vital market information and tools that are necessary to facilitate real estate transactions. The plaintiffs assert that these barriers, imposed by Defendant, do not simply affect individual competitors but have broader implications for the market as a whole, as they distort the conditions of competition and lead to a less dynamic, less competitive marketplace."). Plaintiffs opposition, like the Amended Complaint, fails to factually support how mandatory membership requirements affect consumers and not just Plaintiffs as individuals.

Plaintiffs complain that the desirable service (MLS access) is impermissibly tied to the undesired membership in the associations, but nowhere do Plaintiffs explain how their forced membership in the associations harms the consumers.[62]  Plaintiffs' vague references to certain rules of the associations without more explanation as to how these rules harm consumers is insufficient to allege the type of antitrust injury sufficient to establish standing.[63]  Further, even assuming Plaintiffs have standing, they fail to state an antitrust claim.

### 2.  Plaintiffs Fail to Plead Adequate Markets

"To state a claim for a violation of § 1 of the Sherman Act, a plaintiff must allege that a defendant engaged in a conspiracy to restrain trade 'in the relevant market.'  … And to state a claim for a violation of § 2, a plaintiff must allege that a defendant, *inter alia*, possessed monopoly power 'in the relevant market.' … It follows then that to sustain claims under either § 1 or § 2, a plaintiff must 'define the relevant market.'"[64]  Failure to properly define the relevant market is grounds for dismissal of Sheman Act claims under Rule 12(b).[65]

---

[62] Since antitrust standing is mandatory to bring an antitrust claim, Plaintiffs' antitrust claims fail. However, because leave to amend is recommended, the Report will also address the substantive flaws in Plaintiffs' allegations to give Plaintiffs fair notice of the deficiencies.

[63] For example, Plaintiffs blanketly assert that the unlawful tying arrangement "limit[s] competition, harm[s] consumers, and disproportionately affect[s] all real estate professionals …." (R. Doc. 38, ¶ 2); that as a result of the exclusion of non-association real estate professionals from cooperating through the MLS system with association professionals, "the market is hindered, leading to fewer options for consumers and negatively affecting overall market dynamics." (R. Doc. 38, ¶ 15); that "defendants' practices disproportionately impact minority consumers and real estate professionals by limiting access to essential data and hindering equitable competition in the market" (R. Doc. 38, ¶18); that "DOJ's recent Statements of Interest regarding buyer-broker agreements have re-emphasized the plaintiffs' concerns over the NAR's rules that mandate these agreements for its members. These rules expose additional anti-competitive practices that harm consumer and stifle market innovation …." (R. Doc. 38, ¶ 20); and that "[r]ecent rule changes by the NAR, such as limitations on buyer agent compensation transparency and the enforcement of exclusive buyer agreements, further disadvantage real estate professionals and consumers." (R. Doc. 38, ¶22). These allegations are conclusory. Plaintiffs do not explain how the rules that are imposed by membership in the organizations at issue operate to have the impact on consumers that Plaintiffs allege exists.  This is insufficient to adequately state an antitrust injury.

[64] *Rx Sols., Inc.*, 164 F.4th at 442 (citations omitted).

[65] *Id.*, citing *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1036 (5th Cir. 2023).

"To determine the 'relevant product market,' courts 'consider the extent to which the seller's product is "interchangeable in use" and the degree of "cross-elasticity of demand between the product itself and substitutes for it."' … Thus, to plead a legally sufficient product market, a plaintiff must 'define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand.' … If a plaintiff fails to do so, or if a plaintiff 'alleges a proposed relevant market that clearly does not encompass all interchangeable product substitutes even when all factual inferences are granted in the plaintiff's favor,' then the 'relevant market is legally insufficient, and a motion to dismiss may be granted.' … 'A legally cognizable product market must "include all commodities reasonably interchangeable by consumers for the same purposes[.]"' … A product market is 'insufficiently pleaded' if it 'fails to identify reasonable substitutes.'"[66]

Plaintiffs do not define any markets in the Amended Complaint.[67] Even liberally construing Plaintiffs' Amended Complaint, to say that the relevant product markets appear to be the markets for real estate association services and MLS services, and that the relevant geographic market is Louisiana for LR and each region associated with the local associations,[68] the Amended Complaint does not contain any information about the extent to which MLS data is interchangeable in use with other services and the degree of cross-elasticity of demand between the service and any

---

[66] *Rx Sols., Inc.,* 164 F.4th at 442 (citations omitted).

[67] Plaintiffs state "Without access to the MLS that serves the specific market area needed, real estate professionals face significant disadvantages in competing effectively. The data provided by the market area MLS is unparalleled and unavailable on any other platform that could offer comparable competitive opportunities, particularly in time sensitive scenarios in both buyer's and seller's markets." R. Doc. 38, ¶ 12. In their opposition memorandum, Plaintiffs say that the product market is real estate brokerage, agency, and appraisal services and that the geographic mart is either the state of Louisiana or a 150-mil radius of the plaintiffs' office locations. R. Doc. 42, p. 18.

[68] However, this may not be sufficient. *See Rx Sols., Inc*., 164 F.4th at 443 (finding the proposed geographic market that was merely where the parties do business legally insufficient and requiring facts regarding "the area of effective competition, commercial realities of the industry, or economic significance of the identified market").

substitutes for it.[69] Because the Amended Complaint fails to adequately define the relevant markets, it fails to state a claim under §§ 1 or 2 of the Sherman Act and dismissal with leave to amend is also warranted on this basis.[70]

### 3. Plaintiffs Otherwise Fail to State a Claim under Section 1 of the Sherman Act (15 U.S.C. § 1)

Section 1 of the Sherman Act prohibits contracts or conspiracies made "in restraint of trade or commerce."[71] To establish a violation of Section 1 of the Act, Plaintiffs must plead that "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market."[72]

Antitrust violations, including tying arrangements like Plaintiffs allege, can be subject to a per se analysis or "rule of reason" analysis. However, conditioning MLS access on association membership should be evaluated under the rule of reason.[73]

#### a. Plaintiffs have not adequately pleaded an agreement to restrain trade.

To satisfy the conspiracy element, Plaintiffs must show that Defendants "engaged in concerted action, defined as having a 'conscious commitment to a common scheme designed to

---

[69] While it could, perhaps, be inferred from Plaintiffs' Amended Complaint that there are no substitutes for MLS access, the Amended Complaint does not expressly say that. Further, because Plaintiffs specifically say that some of them canceled their memberships in the Roam MLS this at least suggests that there may be available substitutes. *See* R. Doc. 38, ¶ 7.

[70] *Rx Sols., Inc*. 164 F.4th at 442-43 (affirming dismissal of federal antitrust claims for failure to state a claim, in part, for failure to adequately allege relevant market); *see also Eytalis*, 2025 WL 2054094, at *5 (finding that the plaintiff failed to establish a relevant market where she pleaded "no facts to support analysis of either the interchangeability of a [sic] multiple listing services or its cross-elasticity of demand" and rejecting the plaintiff's argument, based on *United States v. Realty Multi-List*, 629 F.2d 1351, 1370 (5th Cir. 1980), that the area MLS constituted a separate relevant market because it provided a unique service that is not interchangeable with other real estate listing platforms).

[71] 15 U.S.C § 1.

[72] *Apani Southwest, Inc. v. Coca-Cola Enterprises, inc.*, 300 F.3d 620, 628 (5th Cir. 2002). As noted, above, Plaintiffs fail to plead a relevant market in the Amended Complaint.

[73] *See Pope v. Mississippi Real Est. Comm'n*, 695 F. Supp. 253, 266 (N.D. Miss. 1988), aff'd, 872 F.2d 127 (5th Cir. 1989); *see also Realty Multi-List, Inc.*, 629 F.2d 1351 (the Fifth Circuit evaluated a Section 1 claim involving membership criteria under the rule of reason.)

14

achieve an unlawful objective."[74] "Because § 1 ... does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy, [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express."[75]

In *Eytalis*, the court held that the plaintiff failed to adequately plead an agreement between the defendants when plaintiff's allegations were conclusory.[76] The *Eytalis* plaintiff alleged, similar to Plaintiffs, that the defendants enforced policies enacted by NAR which resulted in mandatory membership in organizations to access MLS services.[77] However, *Eytalis* found that the plaintiff did not allege facts to support a conclusion that the defendants agreed to restrain trade because she did not state facts showing that their objectives were unlawful as the law requires.[78] While other courts have held that the allegation of a policy restricting access to MLS data based on NAR membership "is the agreement" to restrain trade and, therefore, further agreement need not be shown under Section 1,[79] Plaintiffs do not point to any case where the Fifth Circuit has adopted this rule. Accordingly, Plaintiffs also fail to state a claim because they do not state specific facts to show that Defendants met and collectively agreed on a method of manipulating the relevant

---

[74] *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008), quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

[75] *Twombly*, 550 U.S. 544, at 553 (internal citations omitted).

[76] *Eytalis*, 2025 WL 2054094, at *6.

[77] *Id.*

[78] *Id.*

[79] *See Muhammad v. Nat'l Ass'n of Realtors, et al.*, No. 24-55423, 2025 WL 2171143, at *11 (E.D. Pa. July 31, 2025), citing *Relevent Sports, LLC v. United States Soccer Fed'n, Inc.,* 61 F.4th 299, 308 (2nd Cir. 2023) (holding that if "the plaintiff adequately alleges that the policy or rule is the agreement itself, then it need not allege any further agreement"); *Davis v. Hanna Holdings, Inc.*, No. 24-2374, 2025 WL 1737782 at *8 (E.D. Pa. June 23, 2025) (adopting the Second Circuit's finding that an alleged anticompetitive policy may itself be the agreement under § 1).

market.[80]  Even if there was an agreement between Defendants to restrain trade, Plaintiffs still fail to state a claim under Section 1 of the Sherman Act.

> b. *Defendants alleged tying arrangement conditioning MLS access on association membership is not an antitrust violation under the rule of reason.*

A tying arrangement under Section 1 of the Sherman Act is "an agreement by a party to sell one product [(also called a tying product)] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."[81] The essential characteristic of an illegal tying arrangement "lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."[82] At the outset, it is not clear that Plaintiffs have sufficiently alleged a tying claim at all because a tying agreement requires allegations of the purchase of two separate products.[83] Plaintiffs do not allege in the Amended Complaint that they have purchased anything at all. Even construing Plaintiffs allegations liberally to assume Plaintiffs are suggesting that they are required to purchase membership in the Defendant associations, Plaintiffs have not alleged that they also

---

[80] *See Eytalis*, 2025 WL 2054094, at *6 (holding the plaintiff's pleadings insufficient to plead an agreement to restrain trade where the amended complaint only pleaded that the defendants restrained trade through their rules, regulations and bylaws).

[81] *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 405 (5th Cir. 2008), quoting *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 461 (1992) (internal citation omitted).

[82] *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (2006) (citation omitted).

[83] *See, e.g, United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange*, 89 F.3d 233, 235 n. 2 ("Tying exists when 'a seller refuses to sell one product, which a buyer desires, unless the buyer also agree to purchase a second product, which is not otherwise desired from this seller on the offered terms ….The desired product is called the 'tying product; the other product is the 'tied' product.") (citing 9 Phillip E. Areeda, Antitrust Law ¶ 1700a (1991) and *Eastman Kodak*, 504 U.S. at 461-62).

purchase membership in the MLS (rather than that access to the MLS is a perk of membership in the Defendant associations).[84]

Even if Plaintiffs have alleged a tying arrangement, not all tying arrangements are per se unlawful. Multiple courts have held that the rule of reason applies to Section 1 claims when membership requirements were at issue.[85] Therefore, Plaintiffs' Section 1 tying claim will be evaluated under the rule of reason.[86]

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its conditions before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.[87]

The rule of reason requires "weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition."[88]

---

[84] Plaintiffs suggest in their opposition memorandum that they have to pay dues to become a member of the Defendant associations. R. Doc. 42, p. 9.

[85] *Supra* n. 73; *see also Monsanto Co.*, 465 U.S. at 761 (rule of reason applies to concerted action on nonprice restrictions); *Muhammad*, 2025 WL 2171143, at *12 (collecting cases and using the rule of reason to hold that conditioning access to an MLS on membership in an association did not violate the rule of reason).

[86] Based on applicable precedent, Plaintiffs' claims do not warrant per se treatment. *See Realty Multi-List, Inc.*, 629 F.2d at 1361 (concluding that the defendant's rule requiring it to deny MLS access to a properly licensed broker because he fails to meet its membership criteria was not per se illegal); *see N. Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008), quoting *Maricopa Cnty. Med. Soc.*, 457 U.S. at 344 n. 15. Additionally, Plaintiffs' allegations fail to state a per se tying arrangement. To plead per se tying Plaintiffs must plausibly allege facts showing: (1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce. *See United Farmers Agents Ass'n, Inc.*, 89 F.3d at 235, n. 2; *see also Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d at 1037. Plaintiffs do not allege any sufficient facts showing that the tie has anticompetitive effects at all without further allegations regarding harm to consumers. As further discussed in the body of the Report, this Circuit has not held that conditioning MLS access on association membership is per se anticompetitive.

[87] *Bd. of Trade of City of Chicago v. United States,* 246 U.S. 231, 238 (1918).

[88] *Monsanto Co.*, 465 U.S. at 764.

*Pope v. Mississippi Real Estate Com'n* provides guidance.[89] In *Pope*, the U.S. District Court for the Northern District of Mississippi, after considering *Realty Multi List*, on which Plaintiffs rely, concluded that conditioning MLS access on country realtor board access was not necessarily anti-competitive.[90] The Fifth Circuit affirmed the district court's decision.[91] The district court in *Pope* found the reasoning of a state court case persuasive in reaching its decision.

> The alleged evil the State identifies is that a few [local] brokers—two were produced at trial—want access to the MLS without the "unnecessary barrier" of Board membership. The remedy sought is removal of "the price of admission to a non-related activity," i.e., Board membership and fees, because one broker testified MLS access is an "economic necessity." ... The State's proposed solution would give a few competitors a monetary advantage over the MLS brokers whose organizing ability, money, and volunteer time has made the service a viable tool for effective selling. Judge Learned Hand's admonition is relevant: "The successful competitor, having been urged to compete must not be turned upon when he wins." *United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2nd Cir. 1945).
>
> A different case would be presented if brokers were unreasonably denied membership in the board and, consequently, access to the MLS. But here, unlike the government in *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351, 1358 (5th Cir. 1980), the State conceded the membership requirements of the board were reasonable.
> . . .
>
> So long as board membership is available to all on a non-discriminatory basis as this record indicates, we will not compel this private trade association to share one of its membership benefits with brokers who, for whatever personal or business reasons, declined to join.[92]

"The Fifth Circuit has not indicated that the requirement of membership should be thrown out entirely but instead held that membership *requirements* must be reasonable."[93] "Numerous federal

---

[89] *Pope*, 695 F.Supp. 253.

[90] *Id.* at 272.

[91] *Pope*, 872 F.2d 127 (5th Cir. 1989).

[92] *Pope*, 695 F.Supp. at 270-71, quoting *State ex rel Miller v. Cedar Rapids Board of Realtors*, 300 N.W.2d 127 (Iowa 1981).

[93] *Id.* at 271 (emphasis in original).

and state courts have declined to hold that an antitrust violation is present where a multiple listing service merely conditions access to the multiple listing service upon membership in a board of realtors."[94]

Plaintiffs' reliance *Realty Multi List, Inc.*[95] is misplaced. Plaintiffs state that *Realty Multi List* provides that tying association membership to MLS access unlawfully restrains trade.[96] In *Realty Multi List*, the Fifth Circuit ultimately held that the specific membership requirements of the defendant were potential restraints on trade, not the mere fact that MLS access was conditioned on membership itself.[97] The defendant in *Realty Multi List* conditioned membership on a variety of factors such as favorable credit reports and business reputation, having an office open during customary hours of business, and purchase of a share of stock.[98] The Fifth Circuit ultimately held that summary judgment was not appropriate in favor of the defendant because the rules were not narrowly tailored to accomplish the defendant's competitive needs.[99] However, *Realty Multi-List* does not stand for the proposition that simply requiring membership in realtor associations to access an MLS alone is an unreasonable restraint on competition. "A private organization may limit its services to its members as long as there is no arbitrary exclusion from membership, even where the services are economically necessary."[100] Plaintiffs even seem to admit in their opposition that every agent needs access to Roam MLS' data, which is provided by third parties

---

[94] *Muhammad*, 2025 WL 2171143, at *12, quoting *Venture Res. Grp. v. Greater N.J. Reg'l Multiple Listing Serv.*, No. 95-0401, 1995 WL 866841 at *2 (D.N.J. Aug. 23, 1995) (citing cases).

[95] *Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980).

[96] R. Doc. 38, ¶ 10.

[97] *Realty Multi-List, Inc.*, 629 F.2d at 1381-86.

[98] *Realty Multi-List, Inc.*, 629 F.2d at 1381-86.

[99] *Id.* at 1389.

[100] *Pope*, 695 F. Supp. at 269, citing *Associated Press v. United States*, 326 U.S. 1, 21–23, (1944); aff'd, *United States v. Associated Press*, 52 F.Supp. 362 (S.D.N.Y. 1943).

and members.[101] This suggests it is a collaborative program that could promote competition. Without sufficient factual allegations as to why membership requirements in any or all Defendant associations are overburdensome or that membership in the associations is not available on a non-discriminatory basis, Plaintiffs fail to state why *Realty Multi List* applies in this case.

Plaintiffs' reliance on *Thompson v. Metro. Multi-List, Inc.* is also misplaced.[102] In *Thompson*, the plaintiffs were a real estate board that allegedly suffered loss of members due to people joining the NAR's local affiliate in Atlanta and a broker who would have been required to join another real estate organization for MLS access.[103] The evidence in that case showed that the plaintiff real estate board competed with NAR's local affiliate and the same board lost members as a result of the tie between NAR's local affiliate and the MLS.[104] The court, finding that the plaintiffs provided sufficient evidence to allege a per se tying violation, did not evaluate the claim under the rule of reason and remanded the case to resolve issues of fact.[105] Absent any allegations that Plaintiffs' claims are subject to a per se tying analysis, the Report will evaluate the claims under the rule of reason.

Plaintiffs fail to sufficiently allege that the membership requirement to access the MLS imposed an unreasonable restraint on trade or that there was any other competition in the market under the rule of reason.[106] Plaintiffs Section 1 tying claim is that Defendants condition MLS

---

[101] R. Doc. 42, p. 9.

[102] *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991). *Thompson* is also a case from the Eleventh Circuit and is not controlling precedent.

[103] *Id.* at 1569-70.

[104] *Id.* at 1578.

[105] *Id.* at 1579.

[106] Plaintiffs do not allege that the fees were excessive. They merely state and restate in various ways that MLS access is necessary and requiring membership to the realtor associations to access the MLS hinders real estate professionals. R. Doc. 38, ¶ 13.

access (the tied product) on association membership (the tying product).[107] However, Plaintiffs

merely allege that Defendants condition Roam MLS access on association membership, which is

insufficient to state a tying claim.[108] "Forcing a buyer to purchase a product he otherwise would

not have purchased is insufficient to establish the foreclosure of competition."[109] Plaintiffs

allegations that they are forced to join Defendant associations to access MLS services are therefore

insufficient to show that the requirement is anticompetitive.[110] Plaintiffs have not alleged what fees

are charged for membership, so they have not alleged that such fees are unreasonable or that any

costs prevent them from becoming members of any of the Defendants. Nor have Plaintiffs alleged

that the membership requirements are discriminatory or sufficiently articulated any other basis for

the Court to conclude that the membership criteria of the Defendant associations is unreasonable.

To the extent that Plaintiffs argue that "recent rule changes by the NAR, such as limitations

on buyer agent compensation transparency and the enforcement of exclusive buyer agreements,

further disadvantage real estate professionals and consumers… by limiting visibility into how

buyer agents are compensated," Plaintiffs provide no additional facts to support this claim and do

not state how this limitation is anticompetitive.[111] Plaintiffs phrase their rule change allegations in

relation to their Fair Housing Act claim, but these mere conclusory allegations are not sufficient

to state that these rules are anticompetitive, as Plaintiffs fail to state how the visibility is limited or

---

[107] R. Doc. 38, ¶ 2. Whether Plaintiff sufficiently allege that they actually have to purchase these separate products to support a tying claim is a different issue. Regardless, conditioning MLS access on association membership does not violate Section 1 of the Sherman Act.

[108] *Id.*

[109] *Muhammad*, 2025 WL 2171143, at *13 (E.D. Pa. July 31, 2025) (citation omitted).

[110] *Id.* ("In the absence of any factual allegations about the cost of NAR membership, how the cost was set, or that the cost was unrelated to maintaining NAR's services or operational costs, Muhammad has failed to show that the cost prohibited him from becoming an NAR member or that the requirement was anticompetitive.").

[111] R. Doc. 38, ¶ 22.

how this is a disadvantage to consumers.[112] Additionally, Plaintiffs mention a "Clear Cooperation Policy" that "harms real estate professionals," but fail to plead what this policy is or what effects it has on consumers.[113] These conclusory allegations are insufficient to state an antitrust claim. The only claim Plaintiffs provide any factual support for, that Roam MLS access is conditioned on association membership, fails as a matter of law. Further, to the extent that Plaintiff challenges any of Defendants' other policies, their conclusory allegations regarding those policies are insufficient to state claim because Plaintiffs do not allege sufficient facts to support the claims.

Plaintiffs, therefore, fail to state a claim under Section 1 of the Sherman Act.[114]

### 4. Failure to Otherwise State Claim under Section 2 of the Sherman Act (15 U.S.C. § 2)

At the outset, Plaintiffs' Section 2 claims fail because, in addition to the reasons already explained, "[i]f a plaintiff cannot show anticompetitive conduct under Section 1, there are no Section 2 claims available."[115] A substantive "violation of section 2 of the Sherman Act is made out when it is shown that the asserted violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident."[116] Though Plaintiffs complain of Defendants' "monopolistic hold" "over crucial

---

[112] *Id.*

[113] R. Doc. 38, ¶¶ 11, 19.

[114] If this Report is adopted and Plaintiffs are given leave to amend their Section 1 claim to develop their allegations as to whether other policies referenced are anticompetitive, Plaintiffs should not focus on mandatory membership but on the other policies mentioned that are potentially anticompetitive as mandatory membership alone is not a violation of Section 1.

[115] *Doctors Hosp. of Laredo v. Cigarroa*, 782 F.Supp.3d 406, 457 (W.D. Tex. 2025), citing *Federal Trade Comm. v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (if "a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2) (remaining citation omitted).

[116] *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015), quoting *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir.1999).

industry information,"[117] "[h]aving or acquiring a monopoly is not in and of itself illegal. The illegal abuse of power occurs when the monopolist exercises its power to control prices or exclude competitors from the relevant market for its products."[118] Competition in the monopolized relevant market is a requirement of a Section 2 claim.[119]

Therefore, to establish a claim under Section 2 of the Sherman Act Plaintiffs must be a competitor in the alleged market.[120] While Plaintiffs are potential consumers of an MLS and current and/or former members of professional associations, Plaintiffs fail to allege that they are *competitors* within any alleged market. Plaintiffs do not contend that they control a professional association or MLS that was being driven out of business by the potential monopolized market or that they were otherwise competitors in the market.[121] Further, Plaintiffs fail to allege that there are any competing professional associations or MLS services that are being excluded by Defendants' acts.[122] Plaintiffs therefore fail to adequately plead a monopoly claim.

To the extent that Plaintiffs assert a claim under the essential facilities doctrine, this claim fails for the same reasons as the general monopoly claim.[123] To state a monopolization theory under the essential facilities doctrine, Plaintiffs must prove "(1) control of an essential facility by a monopolist; (2) the monopolist's denial of the use of the facility to a competitor; (3) the

---

[117] R. Doc. 42, p. 11.

[118] *Id.*, citing *United States v. E.I. du Pont de Nemours*, 351 U.S. 377, 391–94 (1956) (discussing Section 2 illegal monopoly power in terms of the potential competitors for the monopolist's product).

[119] *Id.* at 335.

[120] As noted above, this claim also fails because Plaintiffs fail to articulate the relevant market.

[121] *Abraham & Veneklasen Joint Venture*, 776 F.3d at 334 (holding that a "member organization" did not violate an elite quarter horse market because they were not competitors as they did not engage in breeding, racing, selling or showing elite quarter horses). Plaintiffs do not allege that they are a competing professional association or that a competing MLS is being forced out of the market by Association Defendants.

[122] *Muhammad*, 2025 WL 2171143, at *16 (holding that plaintiff failed to state a monopoly claim in part because "[the Second Amended Complaint] fail[ed] to allege or identify any competitors in the relevant market, let alone include allegations regarding the strength of the competition.").

[123] R. Doc. 38, ¶ 10.

competitor's inability practically or reasonably to duplicate the essential facility; and (4) the monopolist's refusal to feasibly provide the competitor with access to the facility."[124] Plaintiffs' essential facilities claims must fail because Plaintiffs do not compete with any Defendant in the MLS or professional association market. Plaintiffs' claims do not in any way describe the existence of a competitor relationship and in fact show a vertical relationship with Defendant associations with resources that Plaintiffs and all other participants in the real estate market access, which does not establish a competitor relationship.[125] Plaintiffs' Section 2 claim should be dismissed with prejudice as Plaintiffs are not alleged competitors with Defendants so that amending Plaintiffs' claims under Section 2 of the Sherman Action would be futile.

### E. Plaintiffs Fail to State a Fair Housing Act ("FHA") Claim (Count VII)

The FHA addresses discrimination in housing. Under the FHA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges ... in the provision of services or facilities in connection therewith, because of race."[126] Courts generally give an expansive interpretation to discrimination under the FHA; "to state a claim under the Act, it is enough to show that race was a consideration and played some role in a real estate transaction."[127] Under the

---

[124] *Helen Brett Enters. v. New Orleans Metro. Convention & Visitors Bureau, Inc.*, No. 95-2888, 1996 WL 346314, at *7 (E.D. La. June 25, 1996), citing *Advanced Health Care Services v. Redford Community Hospital*, 910 F.2d 139, 150 (4th Cir. 1990); *Twin Lab, Inc. v. Wider Health & Fitness*, 900 F.2d 566, 569 (2nd Cir.1990); *Fergunson v. Greater Pokotola Chamber of Commerce*, 848 F.2d 976, 983 (9th Cir. 1988).

[125] *See Helen Brett Enters.*, 1996 WL 346314, at *7 ("the allegations in the complaint establish that the defendant and plaintiff occupied different market levels in the chain of distribution for the leasing of space at the convention center. Any relationship between the entities is therefore vertical. Accordingly, plaintiff is not in competition with Facility Management and cannot establish a violation of the essential facilities doctrine.") (citations omitted). Plaintiffs cite to *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 991-992 (D.C. Cir. 1977) in support of their essential facilities claim, but *Hecht* does not help Plaintiffs as that case also stands for the proposition that only competitors can assert claims under the essential facilities doctrine. *See Hecht*, 570 F.2d at 993 ("The essential facility doctrine, also called the 'bottleneck principle,' states that 'where facilities cannot practicably be duplicated *by would-be competitors*, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility.'") (emphasis supplied).

[126] 42 U.S.C. § 3604(b).

[127] *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986), citing *Moore v. Townsend*, 525 F.2d 482 (7th Cir. 1975).

24

FHA, discrimination based on race can be "demonstrated by either 'a showing of a significant discriminatory effect' or 'proof of discriminatory intent,' that is disparate impact or discriminatory treatment."[128]

Plaintiffs bring a claim under the FHA, alleging that Defendants' rules cause a disparate impact to minority/protected communities.[129] "[D]isparate-impact claims 'involve [policies or] practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'"[130] In order to claim disparate impact, Plaintiff must "identify a 'specific test, requirement, or practice' that is responsible for the disparity."[131]

The only rule/policy that Plaintiffs specifically articulate in the Amended Complaint is that one must be a member of the national, state, and local professional association to access Roam MLS.[132] Plaintiffs' general allegations that Defendants have other "rules and policies" that violate the FHA, without actually naming any policies, is insufficient to state a claim under the FHA.[133] Further, even if Plaintiffs identified policies that had a potentially disparate impact, Plaintiffs' allegations that any discrimination occurred are wholly conclusory.

Under the FHA, "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of

---

[128] *L & F Homes and Dev., L.L.C. v. City of Gulfport, Miss.*, 538 Fed.Appx. 395, 400 (5th Cir. 2013), citing *Hanson*, 800 F.2d at 1386 (5th Cir. 1986).

[129] R. Doc. 38, ¶¶ 43-44.

[130] *L & F Homes & Dev., L.L.C.*, 538 Fed.Appx. at 400 (5th Cir. 2013), quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003).

[131] *Id.*, quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005).

[132] R. Doc. 38, ¶¶ 2, 7.

[133] *Jones v. Caliber Home Loans, Inc.*, No. 18-1023, 2019 WL 3366104, at *4 (M.D. La. July 25, 2019).

disparate impact."[134] Aside from general conclusory allegations that Defendants "effectively discriminate against protected classes under the Fair Housing Act" and "exacerbate existing disparities in the real estate industry," Plaintiffs provide no factual support that any of Defendants' policies have disparate impacts on protected groups.[135] Plaintiffs further assert that Defendants' policies and practices disparately impact minority consumers and communities access to essential data, equitable competition in the market, and market entry.[136] However, there is not a single fact in the Amended Complaint that shows how any of Defendants' policies specifically limit minority consumers and communities. Therefore, Plaintiffs wholly conclusory allegations are insufficient to state a disparate impact claim. Plaintiffs further allege that Defendants' policies limit opportunities for licensed real estate professionals operating in compliance with Fair Housing laws and implement policies that result in non-compliance with fair housing requirements for real estate advertising.[137] However, these allegations are also insufficient to state a disparate impact claim.

To the extent Plaintiffs contend generally that Defendants' rules on buyer-broker agreements and buyer agent compensation transparency violate fair housing laws, Plaintiffs point to no facts that show a causal connection to discriminatory effect or to a specific policy Defendants have regarding buyer-broker agreements.[138] Plaintiffs simply allege that rule changes such as "limitations on buyer agent compensation transparency and the enforcement of exclusive buyer agreements, further disadvantage real estate professionals and consumers."[139] Yet again, Plaintiffs provide no factual support there is any disparate impact on any protected class as a result of any

---

[134] *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 543 (2015).

[135] R. Doc. 38, ¶ 43.

[136] *Id.* at ¶¶ 2, 18.

[137] *Id.* at ¶ 23.

[138] *See id.* at ¶¶ 20, 22.

[139] *Id.* at ¶ 22.

of Defendants policies. Plaintiffs allege that limiting visibility "undermine[s] trust and hinder[s] informed decision-making for both agents and consumers."[140] This allegation is neutral and no disparate impact would occur if all agents and consumers are equally impacted.

Plaintiffs fail to reference any protected class throughout their Amended Complaint and do not further develop their claims in opposition to the Motion to Dismiss.[141] Plaintiffs' threadbare and conclusory allegations are insufficient to state a claim under the Fair Housing Act.[142]

### F.  Plaintiffs Agree to Dismiss their First Amendment Claim (Count XI)

Defendants seek to dismiss Plaintiffs' First Amendment claim in their Motion to Dismiss.[143] In reply, Plaintiffs state that they "do not oppose the dismissal of the First Amendment claim" and further seeks to strike the First Amendment claim from their Amended Complaint in the attached order.[144] Plaintiffs First Amendment claim should be dismissed by consent of the parties without leave to amend.

---

[140] *Id.*

[141] Plaintiffs still fail to identify a protected class that is experiencing a disparate impact and further claim that a "fair housing expert" at trial will help develop their claims. R. Doc. 42, p. 28. Plaintiffs also state, "The obfuscation of compensation information undermines the ability of consumers to make fully informed decisions, a cornerstone principle in promoting a fair and competitive marketplace. This lack of transparency not only raises concerns of potential violations of the FTC truth in advertising regulations but also poses risks of fair housing violations. By concealing critical financial information, the rule may inadvertently contribute to discriminatory practices by obscuring costs that could disproportionately affect certain groups of buyers." R. Doc. 42, p. 12. Though these statements are not in the Amended Complaint, even if considered, they still do not allege facts sufficient to state a Fair Housing Act claim. Additionally, Plaintiffs Amended Complaint removes the FTC as a cause of action. *See* R Doc. 38, ¶¶ 34, 35; *see also* R. Doc. 33, p. 3 (removing "Count III: Violation of Federal Trade Commission Act, as Plaintiffs have determined that this claim is not relevant to the current action.").

[142] To the extent that Plaintiffs' claims can be construed as disparate treatment, this requires allegations of deliberate discrimination. *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 909–10 (5th Cir. 2019), citing *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000). There are no such allegations of deliberate discrimination in the complaint and Plaintiffs do not plead a cognizable disparate treatment claim. Because it cannot be said beyond doubt at this point that Plaintiffs can prove no set of facts in support of their FHA claim that would entitle them to relief, they should be given leave to amend it.

[143] R. Doc. 41-1, p. 27.

[144] R. Doc. 42-1, p. 29; R. Doc. 42-2, p. 2.

**G. The Court Should Defer Evaluating Plaintiffs' State Law Claims (Counts II, IV-VI, IX-X)**

To the extent that Plaintiff's allegations may invoke the supplemental jurisdiction of this court over potential state law claims, a district court may decline the exercise of supplemental jurisdiction if a plaintiff's state law claims raise novel or complex issues of state law, if the claims substantially predominate over the claims over which the district court has original jurisdiction, if the district court has dismissed all claims over which it had original jurisdiction, or for other compelling reasons.[145] Having recommended that Plaintiff's federal claims be dismissed, some with leave to amend, as discussed below, evaluation of the state law claims should be deferred.

**H. Leave To Amend**

The decision to allow amendment of the pleadings is within the sound discretion of the Court.[146] "Ordinarily, a pro se litigant should be offered an opportunity to amend his complaint before it is dismissed."[147] In determining whether to allow an amendment of the pleadings, the Court considers: undue delay in the proceedings, undue prejudice to the opposing parties, timeliness of the amendment, and futility of the amendment.[148] "At some point, a court must decide that a plaintiff has had fair opportunity to make her case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit."[149]

Plaintiffs have had two opportunities to plead their best case. When Plaintiffs filed their original complaint, they asserted claims under the Clayton Act, Fair Housing Act, and Federal

---

[145] 28 U.S.C. § 1367.

[146] *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994).

[147] *Wiggins v. Louisiana State University—Health Care Services Division*, 710 Fed. Appx. 625, 627 (5th Cir. 2017) (internal quotation marks omitted).

[148] *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1163 (5th Cir. 1982).

[149] *Jacquez v. Procunier*, 801 F.2d 789, 792-93 (5th Cir. 1986); *Schiller v. Physicians Res. Group Inc.*, 342 F.3d 563 (5th Cir. 2003).

Trade Commission Act along with multiple state law claims.[150] Defendants filed a Motion to Dismiss, addressing in their support memorandum Plaintiffs' federal claims, along with any potential Sherman Act claims Plaintiff could bring under antitrust law.[151] Plaintiffs opposed dismissal,[152] then filed a Motion for Leave to Amend Complaint, adding Sherman Act claims, First Amendment Claims, and two additional state law claims, and removing the Federal Trade Commission Act claim.[153] The Court granted the Motion and, subject to Local Rule 12, the Court dismissed Defendants' first Motion to Dismiss.[154] Plaintiffs had time to review Defendants' first Motion to Dismiss and to supplement their complaint with factual allegations, not just legal conclusions. However, Plaintiffs have not had the opportunity to hear that their claims are inadequately pleaded from the Court. Because Plaintiffs' Clayton Act and Sherman Act Section 2 claims are futile,[155] Plaintiffs should not be given leave to amend those claims. Plaintiffs also should not be given leave to amend their claim under the First Amendment of the United States Constitution because they have agreed to dismiss it. However, Plaintiffs should be given leave to amend their claim against Kenneth Damann, their claim under Section 1 of the Sherman Act, and their Fair Housing Act claim. Plaintiffs are warned that the Court is unlikely to grant additional leave to amend if Plaintiffs fail to adequately plead their claims again.

---

[150] *See* R. Doc. 1.

[151] *See* R. Doc. 29, R. Doc. 29-1.

[152] R. Doc. 30.

[153] R. Doc. 33, R. Doc. 38.

[154] R. Doc. 40.

[155] *Stripling v. Jordan Production Co., LLC*, 234 F.3d 863, 873 (if an amended complaint would fail to state claim under Fed. R. Civ. P. 6, the court may deny leave to amend as futile).

## III.    RECOMMENDATION

Though Plaintiffs assert many causes of action, Plaintiffs fail to assert antitrust injury or an adequate market and Plaintiffs' antitrust claims do not plausibly plead a claim upon which relief can be granted. Additionally, Plaintiffs' fail to state a plausible claim under the Fair Housing Act. Plaintiffs have also agreed to dismiss their First Amendment claim. To the extent Defendants challenge Carla DeYoung's classification as "lead plaintiff,"[156] all Plaintiffs have signed the Amended Complaint, Opposition Memorandum, and Surreply.[157] There is no evidence that Carla DeYoung is actually representing any other pro-se litigant. Because Plaintiffs fail to state a claim upon which relief can be granted,

**IT IS RECOMMENDED** that the Motion to Dismiss the Amended Complaint for Failure to State a Claim,[158] filed by Defendants Greater Baton Rouge Association of REALTORS®, Inc.; New Orleans Metropolitan Association of REALTORS®, Inc.; Bayou Board of REALTORS®; Inc.; Greater Central Louisiana REALTORS® Association, Inc.; REALTOR® Association of Acadiana; Louisiana REALTORS®; Roam MLS, LLC; National Association of REALTORS®; and Kenneth Damann, be **GRANTED IN PART**, and that Plaintiffs' federal claims against them be **DISMISSED**, as follows:

**IT IS FURTHER RECOMMENDED** that Plaintiffs' claims under the Clayton Act, under Section 2 of the Sherman Act, and under the First Amendment of the United States Constitution be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that Plaintiffs' claims against Kenneth Damann, under Section 1 of the Sherman Act, and under the Fair Housing Act be **DISMISSED WITHOUT**

---

[156] R. Doc. 41-1, p. 29.

[157] R. Doc. 38, pp. 13, 15; R. Doc. 42, p. 32; R. Doc. 46.

[158] R. Doc. 41.

30

**PREJUDICE.** If this Report and Recommendation is adopted, Plaintiffs should also be given twenty-one (21) days to amend their complaint. Failure to timely amend should result in dismissal of these claims with prejudice. Plaintiffs should not attempt to replead any federal claims that were dismissed with prejudice.

**IT IS FURTHER RECOMMENDED** that if this Report and Recommendation is adopted, evaluation of Plaintiffs' state law claims be **DEFERRED**.

Signed in Baton Rouge, Louisiana, March 6, 2026.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

31