# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

Carla DeYoung, Tammy Jo Williams        **Civil No. 3:25-cv-00001-SDD-EWD**

Darlene Currie, Carlos Alvarez

      Plaintiffs,               **JUDGE SHELLY D. DICK**
      **V.**

Greater Baton Rouge             **MAJ. ERIN WILDER-DOOMES**

Association of Realtors, Inc.   ,

New Orleans Metropolitan Association

of Realtors, Inc.,

Bayou Board of Realtors, Inc.,

Greater Central Louisiana Realtors

Association, Inc.,

Realtor Association of Acadiana,

Louisiana REALTORS®

ROAM MLS, LLC,

National Association of Realtors,

Kenneth Damann

        Defendants,

# PLAINTIFFS' SECOND AMENDED COMPLAINT

**TABLE OF CONTENTS**

**INDEX OF EXHIBITS**

**(Page 1 of 3)**

**(Page 2 of 3)**

**(Page 3 of 3)**

**EXHIBITS AND INCORPORATED MATERIALS**

**I. INTRODUCTION AND NATURE OF THE ACTION**

**II. PARTIES**

**III. JURISDICTION AND VENUE**

**IV. SHERMAN ACT § 1, ANTITRUST STANDING, EXCLUSIONARY RESTRAINTS, THREE-WAY TYING STRUCTURE, SEPARATE PRODUCT, MARKET POWER, AND CONTINUING ENFORCEMENT**

**V. FAIR HOUSING ACT / MARKET TRANSPARENCY / CONCEALMENT OF MATERIAL INFORMATION**

**VI. DEFENDANT KENNETH DAMANN'S PERSONAL PARTICIPATION IN THE CHALLENGED CONDUCT**

**VII. REPUTATIONAL HARM TO PLAINTIFFS AND SIMILARLY SITUATED LICENSED PROFESSIONALS**

**VIII. DAMAGES TO PLAINTIFFS, INCLUDING REPUTATIONAL HARM, LOSS OF GOODWILL, AND EMOTIONAL DISTRESS**

**IX. COUNTS / CAUSES OF ACTION**

**X. DAMAGES**

**XI. REPUTATIONAL HARM / LOSS OF PROFESSIONAL GOODWILL**

**XII. PRAYER FOR RELIEF**

**XIII. JURY DEMAND**

**INDEX OF EXHIBITS**

Exhibit A4 ... Pages _____ 80

Exhibit A6 ... Pages _____ 71

Exhibit A7 ... Pages _____ 91

Exhibit B1 ... Pages _____ 71

Exhibit B2 ... Pages _____ 72

Exhibit B3 ... Pages _____ 72

Exhibit B4 ... Pages _____ 72

Exhibit B7 ... Pages _____ 91

Exhibit B8 ... Pages _____ 43

Exhibit B9 ... Pages _____ 24

Exhibit C ... Pages _____ 17

Exhibit C1 ... Pages _____ 25

Exhibit C2 ... Pages _____ 51, 52

Exhibit C3 ... Pages _____ 49, 52

Exhibit C4 ... Pages _____ 46, 87, 88

Exhibit C5 ... Pages _____ 47, 87, 88

Exhibit C6 ... Pages _____ 82

Exhibit C7 ... Pages _____ 82

Exhibit C8 ... Pages _____ 34, 35, 36

Exhibit C9 ... Pages _____ 83, 84

4

Exhibit D ... Pages _____ 18, 19

Exhibit D1 ... Pages _____ 19

Exhibit D2 ... Pages _____ 19

Exhibit D4 ... Pages _____ 58

Exhibit D5 ... Pages _____ 34, 85

Exhibit D6 ... Pages _____ 62, 63, 74

Exhibit D7 ... Pages _____ 64


Exhibit E ... Pages _____ 67, 68

Exhibit F ... Pages _____ 26

Exhibit G ... Pages _____ 56, 57, 79

Exhibit H ... Pages _____ 59, 60

Exhibit I ... Pages _____ 60

Exhibit J ... Pages _____ 49, 52

Exhibit K ... Pages _____ 60, 79

Exhibit M ... Pages _____ 53, 54, 57, 66, 68, 79

Exhibit P ... Pages _____ 81, 82

Exhibit Q ... Pages _____ 39, 40

Exhibit S ... Pages _____ 57, 66, 79

Exhibit T ... Pages _____ 46

Exhibit U ... Pages _____ 44, 45

Exhibit V ... Pages _____ 41

Exhibit W ... Pages _____ 41

Exhibit X ... Pages _____ 41

Exhibit Y ... Pages _____41

Exhibit Z ... Pages _____50, 51

Exhibit Z1 ... Pages _____86

Exhibit Z3 ... Pages _____21

Exhibit Z4 ... Pages ___footnote only_____25

Exhibit Z5 ... Pages _____25

Exhibit Z7 ... Pages _____26, 27

Exhibit Z8 ... Pages _____37

Exhibit Z9 ... Pages _____62, 80

Exhibit Z10 ... Pages _____63

Exhibit Z11 ... Pages _____55

**EXHIBITS AND INCORPORATED MATERIALS**

Plaintiffs further allege that the exhibits attached to this Second Amended Complaint, as well as documents, images, screenshots, transcripts, correspondence, and other materials referenced, reproduced, or incorporated within the body of this Second Amended Complaint (including materials identified in footers, citations, or exhibit header pages), are incorporated herein by reference for all purposes. Plaintiffs further allege that these exhibits and materials include, without limitation, public records, publicly available webpages and publications, official organizational materials, official communications, emails, billing records, photographs, screenshots, correspondence, transcripts, meeting materials, entity-registration records, and other documents in Plaintiffs' possession or obtained from sources reasonably believed to be authentic. Plaintiffs attach, reference, or reproduce these materials as factual support for the allegations herein. To the extent any exhibit or referenced material reflects a public record, official publication, government record, court filing, publicly available webpage, organizational publication, or other source accessible by website link or citation, Plaintiffs rely on such material as incorporated herein without the need to restate the nature or source of each exhibit or referenced item individually.

**I. INTRODUCTION AND NATURE OF THE ACTION**

1. Plaintiffs file this Amended Complaint pursuant to the Court's March 25, 2026 Order. Plaintiffs replead the federal claims dismissed without prejudice, including their claims against Defendant Kenneth Damann, continue to assert the state-law claims whose evaluation was expressly deferred, and do not reassert any claims previously dismissed with prejudice in compliance with the Court's Order. Plaintiffs expressly reserve all rights to seek review of the claims dismissed with prejudice at the appropriate time.

2. This civil action seeks damages, declaratory relief, and injunctive relief for violations of federal and state law arising from Defendants' alleged unlawful restraint of trade, anticompetitive tying arrangements, compulsory association membership requirements, breach of contractual obligations, unjust enrichment, coordinated exclusionary conduct, and related acts that interfered with Plaintiffs' access to essential real-estate data, MLS-related platforms, and the ability to compete in their profession.

3. Plaintiffs reassert and amend their claims against Defendant Kenneth Damann, their claim under Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1), and their Fair Housing Act claim, and continue to assert their previously pleaded state-law claims, including claims for breach of contract, unjust enrichment, Louisiana antitrust violations, and civil conspiracy, against all defendants, together with related damages and equitable relief, as more fully set forth below.

4. Plaintiffs allege that Defendants have engaged in anticompetitive and exclusionary practices, including conditioning access to MLS data and MLS-related platforms—the product Plaintiffs sought to obtain—on compulsory membership in local, state, and national REALTOR®

8

associations, together with the payment of dues, fees, and related charges associated with that three-level membership structure.

5. Plaintiffs further allege that Defendants themselves treat MLS access and MLS participation as distinct and separately monetized from association membership by separately billing, separately itemizing, and separately taxing MLS-related charges apart from local, state, and national association dues and membership fees. Plaintiffs allege that Defendants' own account statements, billing history, and published fee schedules distinguish between "Association Membership Dues" and "MLS/Misc Billing," separately list MLS participation charges, and show that MLS is charged "plus tax," thereby confirming that MLS access is treated as a distinct product even while Defendants refuse to offer it on a standalone basis without compulsory purchase of the bundled three-association membership structure.

6. Plaintiffs further allege that these practices restrict competition, impose unwanted bundled purchases, deny or burden access to essential real-estate data, and interfere with Plaintiffs' ability to lawfully and effectively compete in their respective professions as real estate professionals and, in the case of Plaintiff Carla DeYoung, as a certified residential appraiser who requested MLS/data access for appraisal-related purposes only and expressly advised that she did not need listing input into the MLS.

7. Plaintiffs seek all relief available under law, including declaratory relief, temporary, preliminary, and permanent injunctive relief, compensatory damages, costs, and all other relief the Court deems just and proper.

## II. PARTIES

8. **Filing and Service Contact for Pro Se Plaintiffs**

Plaintiff Carla DeYoung is designated solely as the filing and service contact for the pro se Plaintiffs in this matter for purposes of electronic filing, receipt of notices, and service of Court documents. This designation is administrative only and does not create any representative capacity or alter the equal status of the Plaintiffs. All service of process and Court notices may be directed as follows:

Carla DeYoung

31185 Walker Rd North

Walker, Louisiana 70785

Telephone: (225) 320-3004 ext. 0

TigerLandProperties@gmail.com

**9. Plaintiffs**

a. Plaintiff Carla DeYoung is a resident of Walker, Louisiana, residing at 31185 Walker Rd North, Walker, Louisiana 70785. Plaintiff operates as a licensed real estate broker through TigerLand Properties, LLC and as a Louisiana State Certified Residential Appraiser through The Appraisal Company, LLC.

b. Plaintiff Tammy Jo Williams is a resident of Walker, Louisiana, residing at 30792 Walker Rd North, Walker, Louisiana 70785. Plaintiff operates as a licensed real estate agent under TigerLand Properties, LLC.

c. Plaintiff Darlene Currie is a resident of Brusly, Louisiana, residing at 3431 Allene Street, Brusly, Louisiana 70719. Plaintiff operates as a licensed real estate agent under TigerLand Properties, LLC.

d. Plaintiff Carlos Alvarez is a resident of Prairieville, Louisiana, with his principal office at 10202 Perkins Rowe, Suite E-160, Baton Rouge, Louisiana 70810. Plaintiff operates as a real estate broker through Supreme, LLC and other brokerage entities.

e. Plaintiff Carla DeYoung also earns income as a Louisiana State Certified Residential Appraiser performing appraisals of real property.

f. All Plaintiffs earn their living, in whole or in substantial part, through the marketing, valuation, and/or sale of real property and the commissions, fees, or appraisal income derived therefrom.

g. Plaintiffs allege that, in order to obtain access to the MLS data in their relevant market areas, they are required to pay dues and maintain membership in three levels of REALTOR® associations—local, state, and national—even where they seek only MLS/data access or limited data-related use. Plaintiffs allege that access to the essential MLS serving their market area is essential to effectively compete in the real estate industry.

**10. Defendants**

11

a. Defendant Greater Baton Rouge Association of REALTORS®, Inc. ("GBRAR") is a Louisiana entity with its principal office located at 14101 Perkins Road, Baton Rouge, Louisiana 70810.

b. Defendant New Orleans Metropolitan Association of REALTORS®, Inc. is a Louisiana entity with its principal office located at 3645 North I-10 Service Road, Metairie, Louisiana 70002.

c. Defendant Bayou Board of REALTORS®, Inc. is a Louisiana entity with its principal office located at 4651 West Park Avenue, Houma, Louisiana 70364.

d. Defendant Greater Central Louisiana REALTORS® Association, Inc. is a Louisiana entity with its principal office located at 4200 Jackson Street, Alexandria, Louisiana 71303.

e. Defendant REALTOR® Association of Acadiana is a Louisiana entity with its principal office located at 234 Rue Beauregard, Lafayette, Louisiana 70508.

f. Defendant Louisiana REALTORS® ("LRA") is a Louisiana entity with its principal office located at 821 Main Street, Baton Rouge, Louisiana 70802.

g. Defendant ROAM MLS, LLC is a Louisiana limited liability company and a consortium and/or jointly controlled MLS entity associated with one or more of the above local REALTOR® associations, with its principal office located at 14101 Perkins Road, Baton Rouge, Louisiana 70810.

h. Defendant National Association of REALTORS® ("NAR") is a national trade association for real estate professionals with its principal office located at 500 New Jersey Avenue NW, Washington, D.C. 20001.

12

i. Defendant Kenneth Damann is an individual who, upon information and belief, at all relevant times served as Executive Vice President of Defendant Greater Baton Rouge Association of REALTORS®, Inc. ("GBRAR"), as registered agent for Defendant GBRAR, and as registered agent for Defendant ROAM MLS, LLC. Plaintiffs allege that, by virtue of these positions and through his direct communications with Plaintiffs, Damann personally participated in, communicated, enforced, ratified, and/or carried out the challenged policies and decisions at issue herein, including policies conditioning access to MLS data and related MLS platforms on compulsory membership in local, state, and national REALTOR® associations and the associated dues and fee structure.

## III. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to **28 U.S.C. § 1331** because this action arises under the laws of the United States, including **Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1,** and the **Fair Housing Act**.

12. This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to **28 U.S.C. § 1367** because those claims, including claims arising under Louisiana antitrust law and other Louisiana law, form part of the same case or controversy under Article III of the United States Constitution.

13. Venue is proper in this District pursuant to **28 U.S.C. § 1391(b)** because one or more Defendants are subject to personal jurisdiction in this District, and because a substantial part of the events, acts, omissions, agreements, transactions, and resulting injuries giving rise to Plaintiffs' claims occurred in, were directed into, were implemented in, or had effects within this District.

13

14.  Venue is further proper in this District because Defendants' challenged conduct involves interstate commerce and interstate restraints on trade, including policies, rules, agreements, and practices that were applied across state lines and caused injury to Plaintiffs and the relevant market.

## IV: SHERMAN ACT § 1, ANTITRUST STANDING, EXCLUSIONARY RESTRAINTS, THREE-WAY TYING STRUCTURE, SEPARATE PRODUCT, MARKET POWER, AND CONTINUING ENFORCEMENT

15. Plaintiffs allege that Defendants have engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act by conditioning practical access to the dominant MLS-linked market-data and participation infrastructure in the Louisiana market areas in which Plaintiffs compete on compelled purchase and maintenance of local, state, and national REALTOR® memberships, together with recurring dues, fees, and related obligations. Plaintiffs further allege that the challenged restraint is implemented through a coordinated three-level membership structure, enforced through broker-level and office-level coercion, maintained through refusal to offer neutral or standalone access, and preserved through continuing rule changes that alter form but not substance. The following allegations set forth the basis for Plaintiffs' claims, and each subsection may be followed by specific supporting factual allegations and exhibits.

### A. PLAINTIFFS' ANTITRUST STANDING AND DIRECT INJURY

14

16. Plaintiffs further allege that they have antitrust standing because they are active participants in the relevant market as licensed Louisiana real-estate professionals and appraisers who compete to provide brokerage, listing, buyer-representation, valuation, appraisal-related, and related residential real-estate services in the Louisiana market areas described herein.

17. Plaintiffs further allege that they are direct victims of the challenged restraint. Plaintiffs are the immediate purchasers, or would-be purchasers, of the tied memberships, dues, and access-related charges imposed through the challenged structure, and they are the immediate users, or would-be users, of the MLS-linked product whose practical access is conditioned on the challenged three-way membership requirement and related restraints.

18. Plaintiffs further allege that their injuries are direct, concrete, and ongoing. Those injuries include, without limitation, compelled or threatened compelled payments; denial or restriction of neutral access; reduced visibility and participation; impaired ability to compete on equal terms; reduced access to data, tools, and participation functions; increased compliance burdens; reduced ability to offer independent, lawful, ethical, and professionally compliant service models; and lost past, present and future competitive opportunities.

19. Plaintiffs further allege that their injuries are not merely derivative of harm to some other class of market participant. There is no more direct or better-situated private plaintiff class to vindicate the specific antitrust injury alleged here because the professionals forced to purchase the tied memberships and submit to the challenged access conditions are themselves the direct market participants immediately burdened by the restraint. Plaintiffs further allege that neither homebuyers nor home sellers are more direct victims of the challenged tying condition than Plaintiffs, because Plaintiffs are the professionals to whom the challenged membership

15

condition is directly applied and from whom the tied payments, compelled memberships, and access restrictions are directly extracted or enforced.

20. Plaintiffs further allege that the full amount of their damages cannot presently be calculated with precision without discovery because Defendants control significant portions of the relevant access records, participation records, listing visibility, buyer-side opportunity data, and related market information. Plaintiffs further allege, however, that the existence of injury is not speculative merely because the exact amount of damages requires discovery.

21. Plaintiffs further allege that allowing this action to proceed does not create a material risk of duplicative recovery or unmanageable apportionment because Plaintiffs seek recovery for their own direct injuries as directly burdened market participants and do not seek to recover every downstream loss suffered by every buyer, seller, or other participant in the affected markets.

22. Plaintiffs further allege that they are not indirect or remote victims, but the immediate market participants forced either to submit to the challenged conditions or to compete at a material disadvantage. Plaintiffs further allege that their injuries constitute antitrust injury because they flow directly from the very feature that makes the challenged arrangement unlawful: Defendants' conditioning of practical access to the MLS-linked product on the compelled purchase and maintenance of separate REALTOR® memberships and related charges.

23. Plaintiffs further allege that Plaintiffs are not alleging that they compete with an MLS database itself, an MLS software vendor, or an MLS platform operator in the sense of operating or selling a competing database product. Plaintiffs do not seek to own, replace, or operate the MLS. Rather, Plaintiffs allege that they compete in the downstream markets for residential real-estate brokerage, listing, marketing, showing, appraisal, valuation, and related

16

professional services, and that access to the relevant market-area MLS-linked data is necessary to compete effectively in those markets. Plaintiffs further allege that the practical value of the relevant MLS-linked platform derives from the broad participation of licensed brokers, agents, appraisers, and other market participants who collectively contribute current listings, status changes, sold-price data, historical listing information, comparable-sales information, and other market-critical data. Plaintiffs allege that they require fair, non-discriminatory access to that dominant local data ecosystem in order to communicate effectively with other industry professionals and to provide timely, current, and accurate information and services to consumers seeking representation in residential real-estate transactions, which often involve one of the largest financial decisions a consumer will make.

## B. THE CHALLENGED THREE-WAY TYING STRUCTURE AND CONDITIONING OF PRACTICAL MLS ACCESS

24. Plaintiffs further allege that Defendants maintain and enforce a coordinated three-level national-state-local REALTOR® membership structure under which practical access to the relevant MLS-linked listing data, historical and sold data, search functions, participation rights, and related tools necessary to compete effectively in residential real-estate brokerage, buyer representation, appraisal-related valuation work, and related licensed real-estate functions is conditioned on compelled membership in, and payment to, local, state, and national REALTOR® associations.

    a. **EXHIBIT C** - official "Cost and Fees" document published by Defendant Greater Baton Rouge Association of REALTORS®, Inc., which discloses mandatory membership requirements. Plaintiffs allege that Exhibit C lists separate, mandatory fees for "Local ($204)," "State ($203)," and "National ($201)"

17

association membership under the heading "Association Fees (Mandatory)," and separately lists "GBRMLS Participation ($396 *plus tax)" under a distinct MLS heading.

25. Plaintiffs further allege that the challenged restraint is not merely a voluntary membership preference, branding choice, or incidental feature of association participation. Rather, Defendants use the three-way membership structure as a coercive access condition tied to the practical ability to obtain or maintain meaningful access to the dominant MLS-linked market infrastructure in the relevant Louisiana market areas. Real time market data and communication between all licensed real estate agents is essential to compete within the real estate profession.

26. Plaintiffs further allege that the challenged restraint is reinforced through broker-level and office-level enforcement mechanisms that place pressure not only on individual licensees and appraisers, but also on brokerage firms and affiliated offices, thereby increasing the coercive force of the arrangement and reducing the practical ability of independent professionals to refuse the challenged conditions. The tying arrangement operates through threats of exclusion that harm not only individual non-paying agents but the broker's entire business and all innocent affiliated agents, constituting an unreasonable and coercive enforcement mechanism designed to maximize revenue extraction and preserve the three-level membership structure through fear of collective punishment.

    a. **EXHIBIT D -** Greater Baton Rouge Association of REALTORS® ("GBRAR") Terms and Conditions governing designated REALTORS®, MLS participants, REALTOR® members, and MLS subscribers. Plaintiffs allege that Exhibit D expressly shows that Defendants condition MLS participation and access on

18

broker-level responsibility for ensuring that affiliated licensees satisfy membership-related requirements and pay the required dues and fees. Plaintiffs further allege that Exhibit D provides that the designated broker must ensure affiliated licensees complete membership application requirements and payment obligations, or else the broker must submit non-member dues for such licensees, and that the broker will be billed for any affiliated licensee who does not satisfy those requirements. Plaintiffs further allege that Exhibit D also states that subscriber/user fees are charged per agent, that the Participant is responsible for all fees for affiliated users, and that delinquency by a participant or subscriber can result in immediate discontinuation of MLS access.

b. **EXHIBIT D1 -** email notice from the Greater Baton Rouge Association of REALTORS® to Plaintiff Carlos Alvarez, in his capacity as broker, regarding delinquent fees attributed to an affiliated agent. The notice identifies the amount due, provides a deadline for payment, and states that if the delinquency is not cured by that date, the office's MLS access will be suspended effective on the stated suspension date.

c. **EXHIBIT D2 -** email dated November 10, 2025, from GBRAR billing to Plaintiff Carlos Alvarez, with the subject line "URGENT: MLS Office Suspension Pending 11/17/25." The email states that charges in the amount of $689.55 were due as of November 10, 2025. The email further states that MLS members in the office with delinquent accounts had been suspended and that the office was subject to MLS suspension for members' delinquent accounts. The email also states: "If a Broker's MLS membership is suspended, that Broker's entire office is

immediately suspended regardless of any individual Agent's payment status." The notice lists the office suspension date as Monday, November 17, 2025, and the last day to pay as midnight, Sunday, November 16, 2025.

27. Plaintiffs further allege that, even after purported policy reforms and public descriptions of modernization or optionality set to be effective 01/01/2026, Defendants have continued to condition practical MLS access in Louisiana on REALTOR® membership, thereby supporting the inference that the challenged restraint remains in force in substance.

    a. **EXHIBIT C2 -** transcript of a recorded telephone conversation on January 23, 2026, between plaintiff Carla DeYoung and a representative of ROAM MLS, occurring immediately after the January 1, 2026 effective date of NAR's revised MLS policies that allegedly "removed" the mandatory membership requirement, in which: (a) the ROAM representative acknowledged that ROAM would be switching to a single MLS platform (FlexMLS vendor) in the fourth quarter of 2026; (b) plaintiff DeYoung specifically inquired whether the new platform would be "available to only members or non-members as well"; (c) the ROAM representative confirmed that while the platform would be available to everyone who purchased MLS services, when asked directly "do you have to be a member of the board or no?" the representative affirmatively stated: "ROAM MLS requires REALTOR® membership"; and (d) plaintiff DeYoung thereafter confirmed her understanding.

28. Plaintiffs further allege that qualified, licensed professionals are therefore forced into a coercive choice: either submit to the three-level membership structure and its related dues,

fees, and rules, or forgo practical access to the dominant MLS-linked market infrastructure necessary to compete effectively.

## C. THE MLS-LINKED PRODUCT IS A SEPARATE PRODUCT DISTINCT FROM ASSOCIATION MEMBERSHIP

29.  Plaintiffs further allege that the MLS-linked product at issue is a distinct product separate from REALTOR® association membership. The relevant product is not merely social affiliation, trade-group identity, or optional association benefits, but practical access to local market-area listing data, historical and sold data, search tools, participation rights, and related MLS-linked functions necessary to compete effectively in the downstream residential real-estate markets.

    a.  **EXHIBIT Z3 -** *Quotes from FTC* "Brokers and agents (hereinafter, "brokers")'s usually are more informed about the local real estate market and the process of a real estate transaction than most home buyers and sellers.'® This informational advantage derives from two sources. First, only brokers have direct access to the MLS, which is a local or regional joint venture of real estate brokers who pool and disseminate information on homes available for sale in their particular geographic areas. ' The MLS provides information both on the homes currently for sale in a particular geographic area and past sales data, which typically are used in determining a home's listing price or a buyer's offer price. Second, most brokers have been involved in many more real estate transactions than their clients. This experience builds expertise in gauging market conditions and knowledge of the details involved in completing a real estate transaction.

21

Why the MLS is Important to Sellers, Buyers, and Brokers As the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers.  Home sellers benefit from exposure of their listings to a wide audience of potential buyers, increasing the probability of selling their homes quickly and at an optimal price for those sellers.  In addition, sellers, through their brokers, can use the MLS information on comparable homes to decide whether to sell their homes and, if so, at what price.  According to NAR's 2006 survey of home buyers and sellers, 88 percent of sellers reported that their home was listed in the MLS.  Buyers also benefit from the MLS because they can go to a single source (that is, a single broker) for information regarding the vast majority of homes for sale within a given area, instead of visiting multiple brokerages to obtain such information. Access to the largest number of potentially appropriate homes for sale allows buyers to maximize their chances of finding a home that most closely matches their desired characteristics.  MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS.54 As previously noted, brokers using the MLS reduce the costs of matching buyers and sellers and can market their service to a large set of potential clients. **Further, by stating up-front the compensation being offered to a cooperating broker, the MLS can reduce the costs associated with listing brokers having to negotiate separately with each potential cooperating broker.**  As a result, the use of an MLS can substantially reduce transaction costs.  The efficiencies

22

associated with use of an MLS in the real estate industry are well documented in the real estate, legal, and economic literature  and in court decisions.58 In the seminal case, *United States v. Realty Multi-List, Inc.,* the Fifth Circuit described the various benefits offered by an MLS.  First, the MLS reduces the "obstacles brokers must face in adjusting supply to demand: market imperfections are overcome in that information and communication barriers are reduced, along with the easing of the built-in geographical barrier confronting the buyer-seller relationship. Moreover, a realistic price structure is engendered. In effect, real estate becomes by virtue of the multiple listing service 'a more liquid commodity.'"  Second, sellers benefit from wider exposure of their listings, while buyers benefit from reduced search costs.  Finally, the court noted that "[t]he broker is particularly benefited by having immediate access to a large number of listings and at the same time by being furnished with a method for quickly and expansively exposing his own listings to a broader market."  Due to these significant efficiencies and procompetitive features, the Fifth Circuit held that the alleged MLS-related restrictions at issue should not be condemned as per se illegal.  At the same time, the Court held that the efficiencies and benefits flowing from the MLS, combined with other factors, resulted in the MLS having market power in a relevant antitrust market, thereby simplifying the rule of reason inquiry concerning the legality of restrictions imposed by the MLS and its members. "

"MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS.  As previously noted, brokers using the MLS reduce the costs of

matching buyers and sellers and can market their service to a large set of potential clients. Further, by stating up-front the compensation being offered to a cooperating broker, the MLS can reduce the costs associated with listing brokers having to negotiate separately with each potential cooperating broker.  As a result, the use of an MLS can substantially reduce transaction costs. "[1]

b. **EXHIBIT B9 -** consists of a National Association of REALTORS® ("NAR") publication titled **"Consumer Guide: Multiple Listing Services (MLSs)."** The document states that MLSs are online platforms that compile home listings from brokerages in a given market. It states that MLSs enable agents to efficiently see available homes for sale and obtain marketplace data, and that MLSs typically share listing information to national and local websites that advertise property information. The document further states that MLSs allow real estate professionals to see, share, and promote homes for sale so they can be found by the largest pool of potential buyers, and that MLSs provide accurate, reliable, and detailed information about properties, including listing price, address, features, disclosures, and square footage. The document also states that, for buyers, using an MLS allows an agent to access many homes for sale and connect with agents working to sell those homes, and that, for sellers, listing on an MLS helps a seller reach the largest pool of buyers and potentially attract the best offer. The document further states that many MLSs share data with websites consumers can access, and that when a buyer or seller works with an agent who has access to an

---

[1] https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf

MLS, the agent can provide MLS property listings that may meet the consumer's criteria.

30. Plaintiffs further allege that Defendants themselves treat the MLS-linked product as distinct from association membership through separate invoicing, separate fee itemization, separate billing lines, separate recurring charges, and separate taxation.

   a. **EXHIBIT Z4 -** reflects that association membership dues dating back to 2002 and MLS-related charges were billed in separate categories. The account history separately identifies **"Association Membership Dues"** and **"MLS/Misc Billing,"** and lists separate invoice entries, dates, and amounts under each category.

   b. **EXHIBIT Z5 -** consists of a screenshot of Carla DeYoung's NABOR billing history showing separate invoice entries for association-related charges and separate invoice entries labeled **"MLS ONLY DUES."** The billing history includes invoices itemizing **NAR Dues, State Dues, Local Dues,** and related charges, and it separately lists an **October 1, 2023** invoice for **"MLS ONLY DUES" ($90.00)** and a **September 16, 2021** invoice for **"MLS ONLY DUES" ($195.00)** with a **New Application Fee ($75.00)**. (MLS tax fee)

   c. **EXHIBIT C1 -** provides the Louisiana statutory framework for taxation of digital products, including electronically accessed and subscription-based products. Plaintiffs further allege that the separate billing and taxation of MLS access is consistent with treatment of the MLS as a distinct digital-access product sold to the subscriber, rather than merely an inseparable incident of association membership.

31. Plaintiffs further allege that the MLS-linked product is technologically, operationally, and commercially distinct from the association entities because access is delivered through separate software platforms, data systems, and vendor relationships, while the associations retain control over whether otherwise qualified professionals may obtain access to that separate product.

    a. **EXHIBIT F -** ***ROAM MLS Q&A***: Plaintiffs further allege that Exhibit F consists of a six-page "ROAM MLS Q&A" document published by the Greater Central Louisiana REALTORS® Association. The document states that **"ROAM MLS is a new MLS entity formed by 4 Associations to deliver the benefits of consolidated MLS services."** The document identifies the included MLSs as **REALTOR® Association owned MLSs**, including GCLRA, Bayou, GBRAR, and NOMAR/GSREIN. The document further states that the **Regional Data Server is cloud-based and hosted by Black Knight** and that **"ROAM offers access to the data through two softwares: Paragon by Black Knight and Matrix by CoreLogic."** The document also states that users may choose **Paragon or Matrix** to access the data and that once ROAM is fully functional, users would access data through the same login for Matrix they already use. The document further states that **"MLS dues are separate from our board fees."**

    b. **EXHIBIT Z7 – Statewide MLS / Greater Southern MLS and ROAM:** Plaintiffs further allege that Exhibit Z7 consists of an article titled **"Statewide MLS"** by Dean Ciaccio, dated **July 30, 2023**. Plaintiffs further allege that the article states that **"The Greater Southern MLS has been working on a program that would leave the AE's from each respective Realtor Board but**

**leverage technology to share listing data, tools and services across Louisiana.”** Plaintiffs further allege that the article states that Greater Southern MLS had **“the potential to let every agent in Louisiana share their listing data as well as sold data”** and had **“an IDX feed to display listings on their real estate websites.”** Plaintiffs further allege that the article states that Greater Southern MLS would allow agents to access the system **“without having to learn a new MLS system.”** Plaintiffs further allege that the article contains a section titled **“ROAM has formed to Compete In Louisiana”** and states that ROAM was formed from the merger of four existing MLSs in Louisiana. Plaintiffs further allege that the article states: **“The sharing of MLS data could have been done years ago, but was only implemented upon the competition of a state wide MLS.”** Plaintiffs further allege that, under a section titled **“ROAM vs GSMLS,”** the article asks, **“What is the difference between Greater Southern and ROAM?”** and answers: **“ROAM has 100% of the current and historical data and is REALTOR® Association-owned.”**

32. Plaintiffs further allege that the facts reflected in Exhibit Z7 support the inference that a broader statewide or cross-market MLS alternative was already being pursued in Louisiana through Greater Southern MLS before ROAM was implemented, and that ROAM's later creation was used to preserve the full current and historical data set within a REALTOR®-association-owned structure. Plaintiffs further allege that the article identifies ROAM's distinguishing feature from Greater Southern MLS not as unique software or technological superiority, but as possession of "100% of the current and historical data" and REALTOR®-association ownership, which is consistent with Plaintiffs' allegation that

27

Defendants' market power arises from collective control over concentrated listing and historical data and the ability to withhold equivalent access from non-member or non-association-controlled alternatives.

33. Plaintiffs further allege that the listing and property data accessible through the MLS/ROAM ecosystem is primarily created, entered, and updated by licensed real-estate professionals and brokers, many of whom operate as independent contractors, not by the Association Defendants themselves. The Association Defendants do not create the underlying housing inventory, do not own the properties being marketed, do not contract directly with the sellers of the listed properties by virtue of association status, do not represent or interact with the buyers of these properties by virtue of association status, and do not contract with lenders or financial institutions that rely on appraisal services for federally related transactions. Rather, Defendants and their affiliated entities control access to the platform, access credentials, downstream dissemination, syndication practices, showing-related interoperability, and the conditions under which licensed professionals may access and use member-generated and market-generated data necessary to compete in real-estate brokerage, appraisal, valuation, and related services.

34. Plaintiffs further allege, upon information and belief and based in part on the personal knowledge of Plaintiff Carla DeYoung, that before ROAM MLS was created, Plaintiff Carla DeYoung attended a meeting at which multiple brokers and representatives of Greater Southern MLS ("GSMLS") presented a proposed broader MLS program for Louisiana and advised attendees that they were seeking support from local brokers to encourage their REALTOR® associations to move forward with contractual discussions necessary to implement that program. Plaintiffs further allege that, at that meeting, GSMLS representatives

stated in substance that the Greater Baton Rouge Association of REALTORS® ("GBRAR") would not sit down to discuss the proposal, and that GSMLS therefore asked brokers in attendance to contact their associations regarding the program. Plaintiffs further allege that GSMLS was available to non-REALTOR® licensees, but that without access to the concentrated current and historical data and without participation by the larger pool of agents whose participation remained tied to Defendants' association-controlled MLS structure, GSMLS did not have the complete data set or critical mass necessary to function as a commercially viable substitute for the association-controlled MLS-linked market access at issue in this case.

35. Plaintiffs further allege that the Tying Product—access to the ROAM platform—is delivered through licensed software, digital data platforms, and computerized database systems that are replicated across thousands of users rather than individually performed, and that the platform functions as a standardized digital product with characteristics of licensable technology and intangible goods

36. Plaintiffs further allege that prior antitrust litigation involving MLS access and compulsory REALTOR® membership confirms that Defendants' challenged conduct is neither novel nor immune from antitrust scrutiny. Plaintiffs further allege that *Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566 (11th Cir. 1991),* is particularly relevant because it addressed both (i) whether compulsory linkage between multilist services and REALTOR® association membership may constitute an unlawful tying arrangement, and (ii) whether such membership restrictions may constitute an unreasonable group boycott or exclusionary restraint under the framework recognized in *United States v. Realty Multi-List, Inc., 629 F.2d 1351 (5th Cir. 1980).* Plaintiffs further allege that, in Thompson, the Eleventh Circuit applied the Realty

Multi-List standard requiring that a multilist service's membership restrictions be reasonably necessary to accomplish legitimate goals and narrowly tailored to that end, and the court found that the challenged REALTOR® membership requirement was not narrowly tailored because the multilist service could have adopted and enforced its own non-solicitation and arbitration rules without forcing brokers to join the REALTORS®. Plaintiffs further allege that Thompson therefore recognized that compulsory REALTOR® membership is not automatically justified merely because Defendants invoke ethics, arbitration, professionalism, or related trade-association goals.

37. Plaintiffs further allege that Thompson is also relevant because it reflects that MLS access and REALTOR® association membership may constitute separate products for antitrust purposes where the economic realities show functional and market distinction. Plaintiffs further allege that the Thompson court held that the plaintiffs had presented sufficient evidence to support a tying claim, including evidence that multilist services and professional association membership were separate products, that the two were tied together, that the defendant possessed market power, that coercion existed, and that a not-insubstantial amount of commerce was affected. Plaintiffs further allege that the factual and economic considerations recognized in Thompson are present here as well, because MLS access in the relevant Louisiana markets is separately demanded in the marketplace, separately billed, separately taxed, separately valued by market participants, and functionally distinct from trade-association membership, lobbying, political advocacy, branding, ethics programming, and other membership-related benefits. Plaintiffs further allege that Defendants nonetheless condition access to that distinct MLS product and its essential MLS-linked market infrastructure upon compelled national, state, and local REALTOR® membership and related

payment obligations, thereby creating the unlawful tying arrangement challenged in this action.  See *Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1579-82 (11th Cir. 1991).*[2]

38. Plaintiffs further allege that *Pope v. Mississippi Real Estate Commission, 695 F. Supp. 253 (N.D. Miss. 1988), aff'd, 872 F.2d 127 (5th Cir. 1989)*, is materially distinguishable because it involved a single board membership requirement, whereas Plaintiffs here allege a far broader and more coercive three-level tying arrangement requiring simultaneous membership in local, state, and national REALTOR® associations as a condition of obtaining and maintaining access to the relevant MLS and its essential MLS-linked market infrastructure. Plaintiffs further allege that this challenged three-way membership structure imposes materially greater costs, burdens, and exclusionary effects than a single-association requirement and serves as a stronger barrier to entry, expansion, and competition.[3] Plaintiffs further allege that, under the standard recognized in *United States v. Realty Multi-List, Inc., 629 F.2d 1351 (5th Cir. 1980)*, whether such a three-way compulsory membership structure is reasonably necessary to any legitimate MLS objective or narrowly tailored to that end depends upon the actual economic realities, market effects, available less restrictive alternatives, and the degree of coercion imposed by Defendants, all of which Plaintiffs allege weigh against the lawfulness of the challenged restraints in this case.[4]

   a. In *Marin County Bd. of Realtors, Inc. v. Palsson, 16 Cal. 3d 920 (1976),* the California Supreme Court held that a realtor board violated the Cartwright Act by denying nonmembers access to its multiple listing service and by limiting membership to persons primarily engaged in the real estate business. The court

---

[2] https://www.casemine.com/judgement/us/5914bf95add7b049347aed10

[3] *Pope v. Mississippi Real Estate Commission, 695 F. Supp. 253 (N.D. Miss. 1988), aff'd, 872 F.2d 127 (5th Cir. 1989)*

[4] *United States v. Realty Multi-List, Inc., 629 F.2d 1351 (5th Cir. 1980)*

31

concluded that MLS access was so essential to effective competition that it had to be made available to all licensed brokers and salespersons who chose to use the service. This decision is significant because it placed realtor associations on notice that member-only MLS access could constitute an unlawful restraint of trade, yet similar exclusionary practices continued to be challenged in later antitrust litigation.

39. Plaintiffs further allege that the relevant value of the MLS-linked product arises not from the association label or the abstract software brand, but from control over the concentrated local listing inventory, historical and sold data, participant network, access permissions, and downstream market distribution tied to the system.

40. Plaintiffs further allege that Defendants' own treatment of ROAM and related MLS-linked operations as separable, transferable, and organizationally distinct from the local association further supports the separateness of the product at issue and the inference that the MLS-linked business is treated as a distinct commercial and operational asset rather than merely an inseparable feature of association membership.

### D. REFUSAL TO OFFER STANDALONE OR LIMITED ACCESS AND EXCLUSION OF QUALIFIED PROFESSIONALS

41. Plaintiffs further allege that Defendants refused to offer neutral, limited, or standalone access to the MLS-linked product even where Plaintiffs specifically requested access tailored to lawful, narrower, and less burdensome licensed uses. Plaintiffs further allege that Plaintiffs sought access only to the actual MLS-linked product and functions they needed—particularly access to market data, sold data, and related tools necessary for lawful appraisal, valuation, and other licensed real-estate uses—without being required to purchase the full tied package

of compelled local, state, and national REALTOR® memberships and the associated obligations. Plaintiffs further allege that Defendants refused to provide such access on neutral or commercially reasonable terms, thereby forcing Plaintiffs either to purchase unwanted tied memberships and submit to the challenged three-level membership structure or to forgo meaningful access to the data and participation functions necessary to compete.

    a. **EXHIBIT** C9 - email exchange between Plaintiff Carla DeYoung and representatives of Defendant Greater Baton Rouge Association of REALTORS®, including statements communicated by Defendant **Kenneth Daman**, concerning Plaintiff DeYoung's request for MLS access without compulsory REALTOR® membership. Plaintiffs allege that Plaintiff DeYoung expressly requested a limited, standalone form of MLS/data access for appraisal-related purposes only, stating that there would be "no input into MLS" and that she required MLS data rather than listing-entry privileges. Plaintiffs further allege that, notwithstanding this narrower request, Defendant Damann responded that Defendants could not provide "an exemption to the existing established pricing or policy." (THREE WAY TIE required to purchase MLS)

42. Plaintiffs further allege that Plaintiffs also requested local association membership and/or participation without compelled national REALTOR® membership, and that such request was denied. Plaintiffs further allege that this denial confirms that Defendants did not offer a less restrictive local path to participation, but instead enforced the challenged structure as a compulsory three-level tie requiring local, state, and national REALTOR® membership as a condition of obtaining practical access to the MLS-linked product and related market-access functions.

a. **EXHIBIT D5 -** email exchange between Plaintiff **Tammy Jo Williams** and Defendant **Kenneth Damann**, in which Plaintiff Williams asked whether she could be "a member of the local association without being a member of the national association," and Defendant Damann responded: "It is not possible to be a member without being a member of NAR. You cannot be a REALTOR without being a member of all 3 — local, state and national associations. That is the definition of REALTOR membership. That is not something that is up to any local board of directors to be able to change."

43. Plaintiffs further allege that this refusal is exclusionary in effect because it denies qualified, state-licensed professionals meaningful access to the data and functions necessary to compete in the same downstream residential real-estate markets as Defendants' members, even where those professionals are willing and able to pay for the actual MLS-linked product they seek but object to compelled purchase of unwanted association memberships and the unreasonable rules associated with said membership.

**MLS-Linked Showing Access and Appointment Restrictions**

a. **EXHIBIT C8 –** ShowingTime Transcript Reflecting MLS-Transferred Showing Contact Data and Baton Rouge Cross-Scheduling Restrictions: Plaintiffs further allege that Exhibit C8 consists of a transcript of a call with ShowingTime regarding changes to showing-contact information and appointment access associated with a listing. Plaintiffs further allege that the ShowingTime representative stated that a non-member contact number appearing in the listing had been "transferred from the MLS," that the information "was changed by someone at GBRAR," and that the non-member contact had been carried over

34

from MLS-transferred data. Plaintiffs further allege that the transcript further reflects that the ShowingTime representative explained that certain MLS systems determine whether cross-scheduling appointments are allowed, and specifically stated that the Greater Baton Rouge association did not allow cross-scheduling appointments on other MLSs, such that an agent "would have to become a member in that MLS in order to be able to book appointments" on those listings. Plaintiffs further allege that the transcript reflects the representative's statement that "They don't. They won't allow cross-scheduling appointments on other MLSs" and that such restrictions may be used so agents "become a member in order to be able to book on those listings."

44. Plaintiffs further allege that Exhibit C8 supports the factual inference that Defendants' challenged restraints affect more than listing display alone and extend into MLS-linked showing access, appointment scheduling, contact routing, and other downstream participation functions necessary for licensed professionals to compete effectively in buyer-side and co-brokered transactions.

45. Plaintiffs further allege that several Plaintiffs are active members of an out-of-state MLS that permits cross-scheduling through ShowingTime. Plaintiffs further allege that Plaintiffs are therefore able to locate Defendant members' listings in ShowingTime and schedule appointments on those listings through the cross-scheduling functionality available through Plaintiffs' own MLS participation. Plaintiffs further allege, however, that Defendant members are not able to locate Plaintiffs' listings in ShowingTime or schedule appointments on Plaintiffs' listings through the same cross-scheduling process, even though Plaintiffs' listings are otherwise capable of being scheduled through ShowingTime and Plaintiffs themselves can

authorize such scheduling. Plaintiffs further allege that Exhibit C8 supports the factual inference that this asymmetry is not the result of any technical limitation, but instead results from Greater Baton Rouge association - linked settings or permissions that block or refuse cross-scheduling access to Plaintiffs' listings for Defendant members. Plaintiffs further allege that this restriction materially harms Plaintiffs by reducing exposure and buyer access to Plaintiffs' listings, burdens Plaintiffs' seller clients by limiting the pool of agents able to readily locate and schedule showings, burdens buyers by restricting practical showing access, and even burdens Defendant members by preventing them from easily locating and scheduling appointments on otherwise available listings.

### E. RELEVANT PRODUCT MARKET AND GEOGRAPHIC MARKET

46. Plaintiffs further allege that the relevant product market for purposes of the challenged restraint is the market for practical access to MLS-linked residential real-estate data and participation infrastructure in the local market areas in which Plaintiffs compete, including concentrated local listing inventory, historical and sold-price data, search and showing-related functions, participant visibility, cooperative transaction access, and related MLS-linked tools and permissions necessary for licensed brokers, agents, and appraisers to compete effectively in residential real-estate brokerage, listing services, buyer representation, appraisal-related valuation work, and related residential real-estate services.

47. Plaintiffs further allege that this MLS-linked product market is distinct from professional-association membership, trade-association advocacy, networking, educational programming, lobbying, or other optional association benefits because the challenged product consists of practical access to concentrated local market data and participation infrastructure

36

that professionals require to compete effectively in the affected downstream residential real-estate markets.

48. Plaintiffs further allege that the relevant geographic markets are the local and regional Louisiana residential real-estate market areas served by the Defendant associations and the challenged ROAM-linked structure in which Plaintiffs actually compete, including, without limitation, the Baton Rouge region and surrounding parishes and other Louisiana local and regional market areas materially affected by the challenged association-controlled MLS-linked structure.

49. Plaintiffs further allege that statewide Louisiana licensure is relevant factual context because Louisiana licenses brokers, agents, and appraisers on a statewide basis, but Plaintiffs do not allege that licensure alone defines the relevant antitrust market. Rather, Plaintiffs allege that competition occurs in the practical local and regional market areas in which listing inventory, sold-data, showing access, buyer opportunities, and transaction pathways are concentrated and controlled through the challenged MLS-linked system and in which Defendants' linked membership-and-access restrictions materially burden or foreclose practical access to that essential market infrastructure.

    a. **EXHIBIT Z8 – 2023 DOJ/FTC Merger Guidelines (Market Definition):** Plaintiffs further allege that Exhibit Z8 consists of pages from the 2023 DOJ/FTC Merger Guidelines stating that relevant antitrust markets include both product and geographic elements, that geographic markets may be defined based on the practical limits of where customers can obtain services, and that relevant markets need **not** have "precise metes and bounds."

**50.** Plaintiffs further allege that another software vendor, branded interface, or nominal MLS alternative is not a practical substitute where Defendants' challenged structure concentrates the dominant local listing inventory, historical and sold data, participant network, and access rights within the Defendant-controlled MLS-linked system serving those same market areas.

**51.** Plaintiffs further allege that the market definitions alleged herein are consistent with those principles because Plaintiffs allege both a distinct MLS-linked product market and practical local and regional Louisiana geographic markets in which Defendants' challenged membership-and-access restrictions operate to burden competition.

## F. ECONOMIC POWER, MARKET CONCENTRATION, AND LACK OF PRACTICAL SUBSTITUTES

52. Plaintiffs further allege that Defendants possess substantial economic power in the tying product because the challenged association-controlled MLS-linked structure controls or concentrates the overwhelming share of practical listing visibility, local inventory access, historical and sold-data access, participant participation, and downstream transaction opportunity in the Louisiana market areas in which Plaintiffs compete.

53. Plaintiffs further allege that the market value of an MLS does not arise from the software interface itself, but from the volume, completeness, concentration, and reliability of local listing inventory and sold-data, together with the number of active participants compelled into that system.

54. Plaintiffs further allege that where Defendants have used coordinated membership conditions and access restraints to consolidate the dominant body of local market data and active participants into their controlled ecosystem, purported alternatives necessarily lack the critical

mass of inventory, sold-data, participation, and functional utility required to serve as realistic substitutes.

55. Plaintiffs further allege that another MLS, another software vendor, or another branded platform is not a practical, economically viable, or competitively meaningful substitute where the underlying local listing inventory, sold data, historical data, participant network, and access permissions remain controlled by Defendants and/or their affiliated entities.

    a.  **EXHIBIT Q – Inman Article on ROAM MLS:** Plaintiffs further allege that Exhibit Q consists of an **Inman** article by **Andrea V. Brambila** dated **July 22, 2021**, titled **"New Realtor-owned statewide MLS to launch in Louisiana."** Plaintiffs further allege that the article states that ROAM MLS would be a **"Realtor-owned statewide MLS"** and that ROAM would have **"78% of Realtors in the state as subscribers"** and would **"cover listings from Central Louisiana to the Gulf Coast."** Plaintiffs further allege that the article states that ROAM was **"formed and jointly owned by four local Realtor associations who operate their own MLSs"**: the New Orleans Metropolitan Association of Realtors / Gulf South Real Estate Information Network (GSREIN), the Greater Baton Rouge Association of Realtors, the Greater Central Louisiana Association of Realtors, and the Bayou Board of Realtors. Plaintiffs further allege that the article states that the New Orleans association had **7,183 members**, the Baton Rouge association had **3,627 members**, the Central association had **446 members**, and the Bayou association had **416 members**, and that when the associations' MLSs were combined into one database, ROAM would cover **"nearly 12,000 of the state's 15,000 Realtors,"** making ROAM **"the biggest

**MLS in the state by far."** Plaintiffs further allege that the article states that ROAM's board of managers had **eight members**, structured so that **"no single association holds a majority."** Plaintiffs further allege that the article states that, when ROAM launched, agents and brokers **"won't have to join a new MLS — the switch will be automatic,"** that they would continue to use **CoreLogic's Matrix system** and **Black Knight's Paragon system**, and that ROAM would have **"one set of MLS rules, fines and data requirements across associations, which will be enforced by Roam."**

    b.  Plaintiffs further allege that **Exhibit Q** also states that there were **"at least two other entities in Louisiana competing to become a statewide MLS,"** including **broker-owned Greater Southern MLS** and **L.A. State MLS**, and that, according to Craig Mirambell and Rosemary Scardina, neither had **"as huge an asset that Roam will have: historical listing data produced by the vast majority of brokers and agents in the state."** Plaintiffs further allege that the article quotes Craig Mirambell as stating: **"[Roam] will have all the historical data in there so appraisers will have an easier time finding [comps] inside of the Roam MLS."**

56. Plaintiffs further allege that, had Defendants elected to provide or license equivalent access to the concentrated current and historical data through the broker-owned GSMLS structure, a broader Louisiana-wide or cross-market alternative could have proceeded without the need to create a separate REALTOR®-association-owned ROAM structure. Plaintiffs further allege that the facts reflected in Exhibits Q and Z7, together with the meeting with GSMLS representatives described above, support the inference that Defendants instead chose to

preserve control of the full data set and the larger pool of participating agents within an association-owned structure, thereby preventing a broker-owned, non-association-controlled alternative from becoming a practical substitute.

57. Plaintiffs further allege that the substantial concentration of licensed professionals and transactions within the challenged REALTOR® membership-linked structure supports the inference that Defendants possess the practical ability to coerce unwanted tied purchases and materially burden or exclude non-member or non-compliant competitors from meaningful participation in the relevant markets.

   a. **EXHIBITS X & Y – Licensed Professionals and Membership Figures:** Plaintiffs further allege that Exhibit X is a screenshot from the Louisiana Real Estate Commission roster page showing **"Roster Entries Found 18125."** Plaintiffs further allege that Exhibit Y is a filing by Louisiana REALTORS® in this litigation stating that **"LR is a membership organization with approximately 14,500 members."** Plaintiffs further allege that these figures reflect **18,125** roster entries in Exhibit X and **approximately 14,500 members** in Exhibit Y.

   b. **EXHIBITS V & W – Buyer-Agent Transaction Counts:** Plaintiffs further allege that Exhibit V consists of a screenshot from the ROAM MLS platform showing a search count of **186** under criteria identifying **"Visibility Type: MLS Listing," "Status: CLS," "Sold Date: 6 Months Back,"** and **"Buyer's Agent: NON MEMBER - NONMEM."** Plaintiffs further allege that Exhibit W consists of a screenshot from the ROAM MLS platform showing a search count of **13,890** under criteria identifying **"Visibility Type: MLS Listing," "Status: CLS,"**

41

**"Sold Date: 6 Months Back,"** and **"Buyer's Agent: Not Equal To NON MEMBER - NONMEM."** Plaintiffs further allege that, when compared, Exhibits V and W reflect ROAM MLS search counts of **186** transactions meeting the non-member buyer's-agent criteria and **13,890** transactions meeting the not-non-member buyer's-agent criteria for the same six-month period.

58. Plaintiffs further allege that the disparity reflected in Exhibits V and W is consistent with Plaintiffs' allegation that buyer-side transaction opportunities in the relevant market area are overwhelmingly concentrated among participants not coded as **"NON MEMBER - NONMEM,"** which in turn reflects the substantial practical power Defendants exercise through control of the MLS-linked participation structure.

**G. CONCERTED ACTION, COMBINATION, AND COORDINATED RESTRAINT OF TRADE**

59. Plaintiffs further allege that the challenged restraint is the product of concerted action, combination, and coordinated enforcement among the National Association of REALTORS® ("NAR"), Louisiana REALTORS®, the relevant local REALTOR® associations, and the association-controlled MLS-linked structure through which practical access is administered and enforced.

60. Plaintiffs further allege that the challenged conduct is not the result of independent parallel action by unrelated firms. Rather, the three-way membership requirement, the conditioning of access on that requirement, the refusal to offer neutral or standalone access, the linked dues obligations, and the coordinated enforcement of participation restrictions all operate through an integrated national-state-local system in which each level depends on and reinforces the others.

a. **EXHIBIT B8 – NAR "The Three-way Agreement":** Plaintiffs further allege that Exhibit B8 consists of a National Association of REALTORS® ("NAR") webpage titled **"The Three-way Agreement,"** identified as extracted from **Section 2, Chapter 1 of The Answer Book.** Plaintiffs further allege that the document states that the term **"Three-way Agreement"** refers to the structure of the REALTOR® organization and that the agreement was established among the **National Association, the state associations, and local boards and associations.** Plaintiffs further allege that the document states that, under this agreement, the National Association grants each association and board the right to control the terms **"REALTOR®"** and **"REALTOR-ASSOCIATE®"** within its territorial jurisdiction. Plaintiffs further allege that the document states that the REALTOR® organization is a **"federation"** or **"union"** of organizations comprised of state and local associations of REALTORS®, and that the **"Three-way Agreement"** means that **all local associations and their REALTOR® members are members of the state association of REALTORS® in the state where their association is located and also of the National Association of REALTORS®.** Plaintiffs further allege that the document states that the federated structure provides a framework for communication, delivery of goods and services, enforcement of the REALTORS® Code of Ethics, and contributes to the political influence of the National Association.

61. Plaintiffs further allege that the facts reflected in Exhibit B8 are consistent with Plaintiffs' allegation that the challenged national-state-local REALTOR® membership structure is not incidental or merely customary, but is an expressly defined organizational framework under

which local REALTOR® membership is linked to simultaneous state and national membership within the same federated structure.

62. Plaintiffs further allege that the challenged system also operates through affiliated MLS-related entities, including ROAM and related structures, which function as the practical access pathway to the local market data and participation rights at issue while remaining linked to the association-controlled membership requirements and restrictions challenged herein.

   a. **EXHIBIT U – RISMedia Article Regarding NAR and "MLS Choice":** Plaintiffs further allege that Exhibit U consists of a **RISMedia** article titled **"PAR Slams NAR Intent to Revoke Charter Over 'MLS Choice' Issue."** Plaintiffs further allege that the article describes a dispute between the National Association of REALTORS® ("NAR") and the Phoenix Association of REALTORS® ("PAR") concerning PAR's refusal to **"cease and desist allowing agents and brokers to access listing services without NAR membership."** Plaintiffs further allege that the article states that, according to PAR, NAR was moving forward with the **charter revocation process** after PAR declined to withdraw its **"MLS Choice"** membership option. Plaintiffs further allege that the article states that, according to NAR's website as quoted in the article, the charter revocation process applies when a state or local association violates NAR's Constitution or Bylaws and continues to operate out of compliance with mandatory policies adopted by the NAR Board of Directors. Plaintiffs further allege that the article quotes PAR as stating that **"MLS Choice is an option for Phoenix area brokers**

44

**to purchase MLS access and services necessary to practice real estate without**

**being required to join an association of REALTORS® at any level."**

63. Plaintiffs further allege that the facts reflected in Exhibit U are consistent with Plaintiffs' allegation that NAR has used its federated governance and charter-enforcement mechanisms to oppose or prevent local associations from offering MLS access on terms that do not require full participation in the national-state-local REALTOR® membership structure.

64. Plaintiffs further allege that the structure and operation of the challenged system support the inference that the restraint is institutional, coordinated, and centrally reinforced rather than merely a discretionary or isolated local practice.

## H. HOLDING-COMPANY RESTRUCTURING AND DEFENDANTS' OWN TREATMENT OF ROAM AS A SEPARABLE BUSINESS ASSET

65. Plaintiffs further allege that Defendants' own internal discussions concerning ownership, restructuring, and holding-company treatment of ROAM further support Plaintiffs' allegations that the MLS-linked business is distinct from the association entity and is treated by Defendants as a separable business asset.

66. Plaintiffs further allege that Defendants have discussed or proposed holding-company, ownership, or operational structures under which the association entity and the MLS-related business would continue as separate operational lines, including scenarios in which the association could continue functioning even if the MLS-related line were altered, divested, or discontinued.

67. Plaintiffs further allege that these facts support the inference that Defendants themselves view the MLS-related business as separable, transferable, and capable of existing as a distinct

operational and economic unit, which is inconsistent with any contention that MLS access is merely an inseparable incident of association membership.

a. **EXHIBIT T – GBRAR Notice Regarding Proposed Legal-Structure Changes:** Plaintiffs further allege that Exhibit T consists of a communication titled **"Fwd: Updates to the GBRAR Articles of Incorporation."** Plaintiffs further allege that the document states that, on **December 10, 2024 at 2:00 p.m.,** a **Zoom Webinar** would be held to review proposed changes to the GBRAR Articles of Incorporation. Plaintiffs further allege that the document states that the proposed changes were based on the work and recommendations of **GBRAR Legal Counsel** and the **GBRAR Board of Directors** and were intended to make **"modification to the legal structure designed to increase liability protections for and from multiple lines of business that GBRAR owns and is engaged in."** Plaintiffs further allege that the document states that these changes were described as **"structural"** and that they **"will not impact operations of the Greater Baton Rouge Association of REALTORS®."**

b. **EXHIBIT C4 – December 2024 Transcript of Holding Company Discussion:** Plaintiffs further allege that Exhibit C4 consists of a transcript of a **December 2024** discussion concerning proposed structural changes involving GBRAR and a holding company. Plaintiffs further allege that the transcript states that ownership associated with **GBRAR** and **ROAM MLS** could be placed **"underneath the umbrella of that holding company."** Plaintiffs further allege that the transcript states that the purpose of the structure was to place different lines of operational business into separate **"silos"** so that if **"the MLS world absolutely blew up and**

46

**the MLS got put out of business,"** that silo could go away while **GBRAR** would continue functioning as GBRAR. Plaintiffs further allege that the transcript states that the proposed changes would require changes to the **Articles of Incorporation** for GBRAR and the establishment of separate **Articles of Incorporation for the holding company itself.** Plaintiffs further allege that the transcript states that the structure being created was **"Association Holdings"** and that **"Association Holdings can only hold GBRAR as a member."** Plaintiffs further allege that the transcript states that the board for the holding company and the board for GBRAR would be the **same board** and that the structure was described as providing **"insulation of losses among the different entities."** Plaintiffs further allege that the transcript also refers to the possibility of moving ownership of other assets or entities under the holding company, including references to moving a building, creating a lease, and protecting funds or ownership interests through the holding-company structure.

c. **EXHIBIT C5 – December 2024 Diagram Depicting Proposed Holding Company Structure:** Plaintiffs further allege that Exhibit C5 consists of a hand-drawn diagram from a **December 2024** discussion concerning proposed structural changes involving GBRAR and a holding company. Plaintiffs further allege that, on the left side of the diagram, **"GBRAR"** appears above references including **"CID, LLC," "ROAMLS,"** and **"PS Forms."** Plaintiffs further allege that, on the right side of the diagram, **"Holding Co."** appears above vertical columns labeled **"GBRAR,"** a crossed-out middle label, and **"CID."**

47

68. Plaintiffs further allege that the facts reflected in Exhibits T, C4, and C5 are consistent with Plaintiffs' allegation that, in December 2024, Defendants were considering or implementing a holding-company structure under which GBRAR and ROAM-related interests could be placed into separate legal silos for the stated purpose of increasing liability protections and insulating losses among multiple lines of business.

## I. CONTINUING RULE CHANGES, POST-LITIGATION ENFORCEMENT, AND CHANGING FORM WITHOUT CHANGING SUBSTANCE

69. Plaintiffs further allege that Defendants' post-litigation and post-settlement rule changes do not eliminate the challenged restraints and, in several respects, confirm Defendants' continuing control over MLS policy and their ability to preserve anticompetitive conditions while changing form rather than substance.

70. Plaintiffs further allege that, despite public descriptions of reform following major litigation and settlement pressure, Defendants have continued to preserve association-controlled gatekeeping over access to data, participation rights, showing-related tools, lockbox-related functions, and related MLS-linked access pathways.

71. Plaintiffs further allege that Defendants' continuing practices support the inference that their policy changes were not genuine abandonment of the challenged restraints, but partial reconfiguration and rebranding of the same underlying coercive structure through which Defendants continue to preserve control over data access, participation rights, and downstream competition.

48

a. **EXHIBIT J – NAR Summary of 2025 MLS Changes:** Plaintiffs further allege that Exhibit J consists of a document titled **"Summary of 2025 MLS Changes."** Plaintiffs further allege that the document states that there are **"several changes in NAR MLS policies and Model MLS governing documents for 2026"** made **"pursuant to the new Multiple Listing Options for Sellers Policy, the recommendations from the MLS Policy Risk Assessment PAG, and more."** Plaintiffs further allege that the document states that the changes are explained in the **2026 Handbook on Multiple Listing Policy** and that **"Self-certification"** by MLSs is required so that local MLS rules and regulations comply with all mandatory policies and rules **effective January 2026.** Plaintiffs further allege that the document states that, unless otherwise indicated, **local adoption is required by March 1, 2026.**

b. **EXHIBIT C3 – MLSBOX "Coming Soon, Activation Date, and Delayed Marketing" Rule Change:** Plaintiffs further allege that Exhibit C3 consists of an MLSBOX posting titled **"NEW: Coming Soon, Activation Date, and Delayed Marketing,"** which states that it was **posted September 8, 2025** under **"MLS Features & Updates."** Plaintiffs further allege that the posting states that **"Coming Soon will be launching September 16th!"** and that, along with the new **Coming Soon** status, **"a new field for Activation Date, and a new field for Delayed Marketing are being added."** Plaintiffs further allege that the posting states that **Coming Soon** is a listing status in which the property is listed and advertised but **"is not yet ready for showings,"** that **showings are not allowed before the Activation Date,** and that **public marketing is allowed but it will not**

**be included in public feeds like IDX.** Plaintiffs further allege that the posting states that **Delayed Marketing** is **"not a status"** but a **Yes/No field** in the Internet Display Options section of the listing, that selecting **Yes** hides the listing from **IDX and syndication data feeds,** and that the property must still be entered into the MLS and visible to participants and subscribers. Plaintiffs further allege that the posting also states under **"What You Cannot Do with Delayed Marketing"** that **"the MLS will not syndicate listings to IDX websites, syndicated portals (e.g., Zillow, Realtor.com), or other public feeds during the delay period."**

c.  **EXHIBIT Z – United States v. National Association of REALTORS® (Memorandum in Opposition to Motion to Dismiss):** Plaintiffs further allege that Exhibit Z consists of a filing in *United States of America v. National Association of Realtors, Civil Action No. 05 C 5140, United States District Court for the Northern District of Illinois, Eastern Division,* titled **"Memorandum of the United States in Opposition to Defendant's Motion to Dismiss,"** dated **February 6, 2006.** Plaintiffs further allege that the filing's **Table of Contents** identifies **Section I** as **"There Is a Live Controversy Before This Court,"** including subsection **I.A** titled **"The United States has jurisdictional standing to sue for injunctive relief even if some illegal conduct ceased prior to litigation."** Plaintiffs further allege that the filing identifies subsection **I.A.1** as **"Courts regularly enter injunctions against conduct that ceased before the government commenced an enforcement action."** Plaintiffs further allege that, in that subsection, the filing cites court authority including *Hecht Co. v. Bowles, 321 U.S. 321, 327 (1944),* and states that **"the cessation of violations, whether**

50

**before or after the institution of a suit . . . is no bar to the issuance of an injunction."**

d. **EXHIBIT C2 – January 23, 2026 ROAM MLS / FlexMLS Membership Requirement Call Transcript:** Plaintiffs further allege that Exhibit C2 consists of a one-page transcript of a telephone call dated **January 23, 2026** concerning the announced switch to **FlexMLS.** Plaintiffs further allege that, in the transcript, the caller asks whether the new MLS access would be available for **"non-members, or is it just going to be for members?"** Plaintiffs further allege that, after the call is transferred to the MLS department, the caller again asks whether the system will be available **"to only members or non-members as well?"** Plaintiffs further allege that the response states: **"It'll be available to everyone who purchased MLS services through the Greater Baton Rouge Association of Realtors."** Plaintiffs further allege that the caller then asks: **"Okay, but do you have to be a member of the board or no?"** Plaintiffs further allege that the response states: **"ROAM MLS requires Realtor membership."** Plaintiffs further allege that the transcript concludes with the caller stating: **"Okay, so that'll be through ROAM. It'll be Flex, but it'll be ROAM."**

72. Plaintiffs further allege that the facts reflected in Exhibits **Z, J, C3, and C2** are consistent with Plaintiffs' allegation that NAR and its affiliated MLS structures have responded to antitrust scrutiny, litigation, or changing legal pressure by revising, renaming, or reformatting rules and policies while continuing materially similar access restraints in operation. Plaintiffs further allege that Exhibit **Z** reflects that, in the prior DOJ antitrust case against NAR, the United States described NAR as changing the challenged VOW policy after antitrust

51

investigation and after notice of suit while, according to that filing, retaining most of the same anticompetitive restraints in substance. Plaintiffs further allege that Exhibit **J** reflects that NAR announced broad 2025–2026 MLS policy and model-rule changes effective **January 1, 2026,** and that Exhibit **C3** reflects local MLS implementation of related listing-status, delayed-marketing, public-feed, and showing changes after this action was filed. Plaintiffs further allege that Exhibit **C2** reflects that, on **January 23, 2026,** after those national changes had become effective, a caller asking whether access through the new FlexMLS transition would be available to non-members was nevertheless told that **"ROAM MLS requires Realtor membership."** Plaintiffs further allege that these facts are consistent with Plaintiffs' allegation that changes in software platform, rule format, listing categories, or policy wording did not eliminate the challenged membership-linked access restraint in practice.

## J. RESTRAINT OF TRADE, EXCLUSION, AND CONTRACT-RELATED ALLEGATIONS

73. Plaintiffs allege that Defendants' conduct has eliminated substantial competition that would otherwise exist by foreclosing qualified professionals who are unwilling to compromise their ethical standards, subject themselves to legal jeopardy, or violate their independent contractor status as a condition of market participation. Plaintiffs allege that absent judicial intervention, there is a dangerous probability that Defendants will continue to foreclose competition, preserve their dominant control over the essential MLS infrastructure, and maintain the tying arrangement through the same exclusionary practices, misrepresentations, and coercion challenged herein, thereby depriving Louisiana consumers of the benefits of a fully competitive real-estate services market.

a. **EXHIBIT M – GBRAR "Your Guide to NAR Settlement and MLS Practice Changes":** Plaintiffs further allege that Exhibit M consists of a multi-page publication branded by **The Greater Baton Rouge Association of REALTORS® (GBRAR)** and titled **"Your Guide to NAR Settlement and MLS Practice Changes."** Plaintiffs further allege that page 1 states that, during the **2024 Regular Session,** the **Louisiana Legislature** passed **HB366,** which **Governor Landry** signed into law, and states that this law **"requires the use of a buyer broker agreement before you tour a home."** Plaintiffs further allege that the same page states that the guide provides **"information and guidance on how the proposed settlement, and the new state law will affect the MLS platform, policies and procedures,"** and includes the heading **"Know the Facts."** Plaintiffs further allege that page 3 states that the **NAR settlement terms, as negotiated by NAR,** include removing buyer-agent compensation fields from the MLS effective **August 15, 2024,** and states that **"no offer can be listed in any field in the MLS (including notes/remarks)."** Plaintiffs further allege that page 4 states that "The settlement terms, as negotiated by NAR as well as the new state law, mandate that participants working with a buyer have a written agreement **before** touring a home," and further states that the agreement **"must describe"** compensation terms and that **"[t]his required change will go into effect on August 15, 2024."** Plaintiffs further allege that page 7 states that **"As of August 15, 2024, all agents working with a residential buyer MUST have a signed written buyer agreement before touring a home,"** and states that **"This is required by both the NAR Settlement and Louisiana State law."**[5]

---

[5] https://gbrar.com/wp-content/uploads/2024/07/Guide-to-NAR-Settlement-and-the-MLS-7.1.24.pdf

74. Plaintiffs further allege that Exhibit M reflects that GBRAR affirmatively represented to members that Louisiana law and Governor Landry's signing of HB366 imposed a blanket pre-showing buyer-agreement requirement, while Plaintiffs allege that the text of Act 690 itself **did not** state that a buyer agreement had to be presented or signed **before** a home could be toured or viewed.

    a. **EXHIBIT N** – Louisiana REALTORS® Comparison Chart for Written Agreements with Homebuyers: Plaintiffs further allege that Exhibit N consists of a one-page graphic published under the Louisiana REALTORS® name titled "Comparison of NAR and State Law Requirements for **Written Agreements with Homebuyers**." Plaintiffs further allege that the chart contains two columns titled "NAR Requirements for MLS Participants" and "State Law Requirements for MLS Participants and Louisiana Real Estate Licensees." Plaintiffs further allege that the chart lists several specific NAR requirements, including disclosure of the amount or rate of compensation, that the amount or rate must be objectively ascertainable and not open-ended, that the MLS participant cannot receive compensation above the amount or rate in the agreement, and that broker fees and commissions are not set by law and are fully negotiable. Plaintiffs further allege that the state-law column states that Louisiana law requires the amount of buyer broker compensation or how that amount will be calculated and a description of services the broker will provide to the buyer, while stating that other listed items are required for MLS participants but "state law does not require" them. Plaintiffs further allege that the chart states at the bottom that the information is "summary in nature and not a complete description of these requirements."

54

75. Plaintiffs further allege that the facts reflected in Exhibit N are consistent with Plaintiffs' allegation that Louisiana REALTORS® selectively identified several NAR requirements that state law did not require, while omitting from that same chart any disclosure that Louisiana law did **not** itself state that a buyer agreement had to be signed before a home could be toured or viewed, even though that claimed pre-showing requirement was among the most egregious, most objected-to, and most consequential changes imposed on Plaintiffs and consumers.

    a. **EXHIBIT Z11 – Baton Rouge Advocate Article on Louisiana Buyer-Agreement Changes:** Plaintiffs further allege that Exhibit Z11 consists of a page from a **The Advocate** article published on **August 26, 2024,** titled **"Buying a house? Here's how a new law has changed the way you pay your real estate agent,"** by **Timothy Boone, Business Editor.** Plaintiffs further allege that the page states: **"A new law that took effect in Louisiana last week requires all homebuyers to have a written agreement with their real estate agent <u>before </u>they can look at a house."** Plaintiffs further allege that the page reflects that the article was published after the effective date of **Act 690** and after REALTOR®-affiliated materials concerning the 2024 buyer-agreement changes had been circulated.

76. Plaintiffs further allege that the facts reflected in Exhibits **M, N, and Z11** are consistent with Plaintiffs' allegation that REALTOR®-affiliated materials and related public reporting created, amplified, and normalized a false narrative that Louisiana law required buyers to sign a buyer agreement **before** touring or viewing a home, even though the text of **Act 690** did not impose such a timing requirement, the **Louisiana Real Estate Commission** expressly acknowledged that the Act did **not** specifically mention timing, and Plaintiffs further allege

that the Commission does **not** require execution **before** a showing but instead requires presentation of the agreement no later than the **time a purchase contract is written.** Plaintiffs further allege that many agents, brokers, and consumers continue to act under that false pre-showing narrative despite the absence of such a requirement in the statute or the Commission's own timing rule.

    d.  **EXHIBIT G** – Louisiana Act 690 / House Bill 366 (Buyer Agreements): Plaintiffs further allege that Exhibit G consists of a three-page copy of Act No. 690 from the 2024 Regular Session, House Bill No. 366, by Representative Davis, identified as an act amending and reenacting portions of La. R.S. 37:1431 and enacting La. R.S. 37:1431(35) and La. R.S. 37:1448.4 relating to Louisiana real estate license law and buyer agreements. Plaintiffs further allege that page 2 of the exhibit defines "buyer agreement" in La. R.S. 37:1431(35)(a) as "a written document signed by a broker and a buyer detailing the services to be provided by the broker to the buyer." Plaintiffs further allege that page 2 also sets forth La. R.S. 37:1448.4(A), which states that "[a] buyer agreement shall be executed between a broker and a buyer," that the agreement "shall include the amount of compensation payable to the broker or the manner in which the amount of compensation payable to the broker shall be calculated," and that the agreement "may provide that the sources of broker compensation may include but is not limited to funds from a buyer, a seller, a listing agent, or any combination thereof." Plaintiffs further allege that the text of the statute shown in Exhibit G does **not** state that a buyer agreement must be executed **before** a buyer tours, views, or is shown a home, and **does not specify a timing requirement** in

56

relation to property showings. Plaintiffs further allege that page 3 states that Section 1 of the Act becomes effective August 19, 2024.

77. Plaintiffs further allege that the text reflected in Exhibit G is consistent with Plaintiffs' allegation that Louisiana Act 690 required a buyer agreement and specified required content, but did **not** itself impose the blanket requirement represented in Exhibit M that a buyer must sign such an agreement **before touring or viewing a home.**

    e. **EXHIBIT S –** Louisiana Real Estate Commission August 15, 2024 Meeting Minutes: Plaintiffs further allege that Exhibit S consists of the Louisiana Real Estate Commission meeting minutes dated August 15, 2024. Plaintiffs further allege that page 3, under "Legal / Legislative," reflects discussion of Buyer Agreements and Act No. 690 of the 2024 Regular Session, which would take effect on August 19, 2024. Plaintiffs further allege that the minutes state that Mr. Devillier read from page two of the Act, including the provisions that a buyer agreement shall be executed between a broker and a buyer and that the agreement shall include the amount of compensation payable to the broker or the manner in which that compensation shall be calculated. Plaintiffs further allege that the minutes specifically state: "Mr. Devillier noted that the Act **does not** specifically mention the timing of that requirement."

78. Plaintiffs further allege that the statement reflected in Exhibit S is consistent with Plaintiffs' allegation that Louisiana regulators expressly recognized that Act 690 did not specify when a buyer agreement had to be presented or executed.

**J1. Factual Materials Corroborating Plaintiffs' Lawful, Ethical, and Professional Objections to the Challenged Rules**

79. Plaintiffs further allege that the following exhibits are offered as factual materials corroborating that Plaintiffs' refusal to submit to the challenged rules and practices was not arbitrary or self-imposed, but was based on substantial legal, ethical, and professional objections despite the resulting loss or restriction of access to MLS-linked data and other competitively necessary tools.

    a. **EXHIBIT D4 – Colorado Division of Real Estate Letter Regarding Buyer Touring Agreements:** Plaintiffs further allege that Exhibit D4 consists of a letter dated **July 12, 2024** on **Colorado Department of Regulatory Agencies, Division of Real Estate** letterhead, signed by **Marcia Waters, Division Director,** and addressed to **Tyrone Adams, Colorado Association of Realtors.** Plaintiffs further allege that the letter states that the Division had received **inquiries and complaints** that consumers were being required to sign **"touring agreements or compensation agreements"** when viewing property. Plaintiffs further allege that the letter states that the Division had received several complaints that real estate brokers **misrepresented** to consumers that such documents were required before homes could be viewed and that consumers were told the documents were required to be signed to view properties. Plaintiffs further allege that the letter states that **"A real estate broker's license is not required to show property in this state,"** that **"Neither single agency nor transaction broker require a signed agreement with a broker to view property,"** and that the Division had **"significant concerns"** about those agreements as used in that context. Plaintiffs

further allege that the letter further states that **"Colorado law does not require a prospective buyer to sign a buyer agreement with a real estate broker to view a property, and that the consumer is under no obligation to sign such an agreement if presented with one."** Plaintiffs further allege that the letter concludes by stating that the matter was being brought to the recipient's attention because it was a **"potential MLS rule that if abused, may be subject the broker to license discipline."**

b. **EXHIBIT H – Alabama REALTOR®-Affiliated Publication Regarding HB 230 and Buyer Agreements:** Plaintiffs further allege that Exhibit H consists of a four-page printout from the **Huntsville Area Association of REALTORS® (HAAR)** website titled **"HB230 Passes AL Senate, Ivey Expected to Sign into Law."** Plaintiffs further allege that page 1 states: **"UPDATE: HB 230 has passed the Alabama Senate and is expected to be signed into law by Governor Kay Ivey."** Plaintiffs further allege that page 2 states that **"HB 230 is a high priority bill that aims to eliminate the confusion over the timing of written buyer agreements,"** and further states that **"[t]he bill clarifies that buyers cannot be forced to sign a binding contract just to view a property and requires a written agreement before submitting an offer."** Plaintiffs further allege that page 3 contains a graphic stating that **"HB 230 REAFFIRMS ALABAMA'S RECAD FRAMEWORK, ENSURING BUYERS AREN'T FORCED INTO WRITTEN AGREEMENTS JUST TO VIEW A PROPERTY,"** and further states: **"It requires written buyer agreements before submitting an offer."**

Plaintiffs further allege that the publication reflected in Exhibit H was issued after Plaintiffs filed this action on **January 2, 2025.**

c. **EXHIBIT I – Mississippi Senate Bill 2713 (Buyer Brokerage Agreement Timing):** Plaintiffs further allege that Exhibit I consists of a four-page copy of **Mississippi Senate Bill 2713** from the **2026 Regular Session,** identified on page 1 as **"As Passed the Senate."** Plaintiffs further allege that page 1 states that the bill would, among other things, **"provide that a licensee shall not be required to enter into a brokerage agreement with a customer who is a prospective buyer in order for a licensee to provide a tour of a property to that prospective buyer"** and would **"set forth when a written brokerage agreement shall and shall not be required."** Plaintiffs further allege that page 2 states that **"[a] licensee shall not be required to enter into a brokerage agreement with a customer who is a prospective buyer in order for a licensee to provide a tour of a property to that prospective buyer."** Plaintiffs further allege that page 2 further states that **"[a] written brokerage agreement shall be required prior to a licensee either listing for sale or submitting an offer on a property on behalf of a client or customer for compensation."** Plaintiffs further allege that page 4 states that the act **"shall take effect and be in force from and after July 1, 2026."** Plaintiffs further allege that the legislation reflected in Exhibit I was introduced and passed after Plaintiffs filed this action on **January 2, 2025.**

d. **EXHIBIT K –** United States Department of Justice Statement of Interest Regarding Buyer-Agreement Rule: Plaintiffs further allege that Exhibit K consists of a seven-page filing titled "Statement of Interest of the United States" filed on

60

November 24, 2024 in *Burnett, et al. v. The National Association of Realtors, et al., Case No. 4:19-cv-00332-SRB, United States District Court for the Western District of Missouri.* Plaintiffs further allege that page 2 states that the United States "continues to scrutinize policies and practices in the residential real-estate industry that may stifle competition," and further states that the proposed settlement in that case included a provision requiring buyers and their brokers to enter "written agreement **before** the buyer tours any home." Plaintiffs further allege that page 2 further states: "This provision itself raises independent concerns under the antitrust laws, which could be addressed in multiple ways." Plaintiffs further allege that page 5 states that the new provision requiring buyers and brokers to make written agreements **before** home tours "**may harm buyers and limit how brokers compete for clients,**" and further states that the provision "**bears a close resemblance to prior restrictions among competitors that courts have found to violate the antitrust laws in other proceedings.**" Plaintiffs further allege that page 6 states that, regardless of whether the agreement had a specific time period, "**buyer brokers under the proposed rule may not show a house, even a no-obligation showing, without first obtaining a written agreement,**" and further states that "**the concerns remain that the broker agreement rule may limit how brokers compete.**"

80. Plaintiffs further allege that the facts reflected in **Exhibits D4, H, I and K** are consistent with Plaintiffs' allegation that Plaintiffs' refusal to submit to or perpetuate a blanket pre-showing buyer-agreement practice was grounded in substantial legal, ethical, and professional concerns, because those materials reflect that forcing buyers into binding written agreements

61

merely to tour or view property was recognized elsewhere as a source of consumer confusion, potential abuse, and improper timing, while the relevant written-agreement requirement was instead identified at a later stage such as before submitting an offer or otherwise engaging in compensated brokerage conduct.

81. Plaintiffs further allege that the following exhibits are offered as factual materials corroborating that Plaintiffs' refusal to submit to the challenged rules and practices was not arbitrary or self-imposed, but was based on substantial legal, ethical, and professional objections despite the resulting loss or restriction of access to MLS-linked data and other competitively necessary tools.

82. Plaintiffs further allege that the following exhibits address other rules, policies, and practices imposed on association members through the challenged REALTOR®-affiliated structure that Plaintiffs did not agree with and objected to for substantially the same legal, ethical, professional, and competition-related concerns previously described.

    f. **EXHIBIT Z9 – NAR Policy on Compensation and Internet Aggregator Syndication:** Plaintiffs further allege that Exhibit Z9 consists of a January 1, 2026 excerpt from the **National Association of REALTORS® Handbook on Multiple Listing Policy** titled **"No Compensation Offers in MLS (Policy Statement 8.11)."** Plaintiffs further allege that the policy states that the MLS may not **"**create, facilitate, or support any nonMLS mechanism **(including by providing listing information to an internet aggregator's website for such purpose)"** for participants, subscribers, or sellers to make offers of compensation to buyer brokers or other buyer representatives. Plaintiffs further allege that the policy also states that use of **MLS data or data feeds** to directly or indirectly

establish or maintain a platform of offers of compensation to buyer brokers or other buyer representatives is prohibited.[6]

g. **EXHIBIT Z10 - Section 1.01 – Clear Cooperation:** Plaintiffs further allege that Section 1.01 of the NAR Clear Cooperation Policy states that **"[w]ithin one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." Plaintiffs further allege that the policy defines "public marketing"** broadly to include, among other things, **flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.** Plaintiffs further allege that the policy's note states that **exclusive listing information** for required property types must be **filed and distributed to other MLS participants for cooperation** under the Clear Cooperation Policy where the listing broker is **publicly marketing** an exclusive listing that is required to be filed with the service and is not currently available to other MLS participants.[7]

## J2. BELOW EXHIBITS IN SUPPORT OF PLAINTIFFS OPPOSITION TO THE IMPOSED RULES:

h. **EXHIBIT D6 – FTC Advertising Standards:** Plaintiffs further allege that Exhibit D6 consists of a one-page excerpt from an **FTC** webpage explaining

---

[6] https://www.nar.realtor/handbook-on-multiple-listing-policy/no-compensation-offers-in-mls-section-1-no-offers-of-compensation-in-mls-policy-statement-8-11

[7] https://realtoracadiana.com/wp-content/uploads/2024/06/ROAM-MLS-Rules-Regulations-v1.0.1.pdf

advertising standards. Plaintiffs further allege that the page states that an advertisement is deceptive if it contains a statement or omission that is likely to mislead reasonable consumers and is **"material"**—defined on the page as **"important to a consumer's decision to buy or use the product."** Plaintiffs further allege that the same page states that an ad or business practice is unfair if it causes or is likely to cause substantial consumer injury that a consumer could not reasonably avoid and that is not outweighed by benefits to consumers.

i.  **EXHIBIT D7** – *United States of America V. National Association of Realtors - United States District Court for the Northern District of Illinois Eastern Division - Civil Action No. 05C5140,* Proposed Final Judgment and Competitive Impact Statement (2020): Plaintiffs further allege that Exhibit D7 consists of a two-page excerpt from a Federal Register publication titled "United States v. National Association of REALTORS® Proposed Final Judgment and Competitive Impact Statement," identified as a Notice by the Antitrust Division dated December 16, 2020. Plaintiffs further allege that the excerpt states that, on November 19, 2020, the United States filed a complaint alleging that certain National Association of REALTORS® ("NAR") rules, policies, and practices resulted in a lessening of competition among real estate brokers and agents to the detriment of American home buyers in violation of Section 1 of the Sherman Act. Plaintiffs further allege that the excerpt states that the proposed Final Judgment was designed to remedy the alleged anticompetitive effects and required NAR to "repeal, eliminate, or modify" rules, practices, and policies alleged to violate the Sherman Act. Plaintiffs further allege that the excerpt specifically states that NAR and

64

NAR-affiliated MLSs **must not** adopt, maintain, or enforce any rule, practice, policy, agreement, or practice that directly or indirectly "**[p]rohibits, discourages, or recommends against**" an MLS participant or REALTOR® "publishing or displaying to consumers any MLS data specifying the compensation offered to other MLS Participants, such as buyer brokers." Plaintiffs further allege that the excerpt also states that NAR and NAR-affiliated MLSs must **not** adopt, maintain, or enforce any rule, practice, policy, agreement, or practice that directly or indirectly "**prohibits, discourages, or recommends against** allowing **any licensed real estate broker or agent** to **access,** with approval from the home seller**, the lockboxes of properties listed on an MLS.**"[8]

83. Plaintiffs further allege that Plaintiffs' refusal to submit to the challenged structure has never been based on an unwillingness to pay for market-area MLS access itself. Plaintiffs allege that they have not claimed that MLS fees alone are the issue. Rather, Plaintiffs object to being compelled to purchase and maintain national, state, and local association memberships, and to being forced into association-imposed rules, restrictions, and governance regimes affecting Plaintiffs' business models, client relationships, and lawful professional conduct.

84. Plaintiffs further allege that the challenged three-way membership structure and related access restraints constitute an unreasonable restraint of trade because they force otherwise qualified and state-licensed professionals to purchase unwanted association memberships and submit to unwanted recurring obligations as a practical condition of obtaining access to the dominant MLS-linked product necessary to compete effectively in the relevant markets.

---

[8] https://www.federalregister.gov/documents/2020/12/16/2020-27685/united-states-v-national-association-of-realtors-proposed-final-judgment-and-competitive-impact

85. Plaintiffs further allege that Defendants breached the membership agreement by affirmatively misrepresenting Louisiana Act No. 690 to members and the public. Plaintiffs allege that Defendants represented through official publications, including the GBRAR Guide (Exhibit M), that Louisiana law requires the use of a buyer broker agreement **before** a buyer may tour a home, when the statute itself contains no such express pre-showing timing requirement and the Louisiana Real Estate Commission ("LREC") stated in its August 15, 2024 meeting minutes that Act No. 690 "does not specifically mention the timing" of that requirement (Exhibit S). Plaintiffs further allege that Exhibit S reflects that Ms. Kim Callaway of Louisiana REALTORS® was present at that LREC meeting during the discussion of Act No. 690 and that "Ms. Callaway added additional details to Mr. Devillier's report," demonstrating that a Louisiana REALTORS® representative was present and participated in the very discussion in which LREC acknowledged that the Act did not specifically impose a pre-showing timing requirement. Plaintiffs further allege that Defendants nevertheless continued to publish and circulate materials stating or implying that buyers were legally required to sign a buyer agreement before viewing a home, thereby disseminating guidance that exceeded the text of the statute despite the contemporaneous clarification reflected in the LREC minutes. Plaintiffs further allege that Defendants failed to correct that representation even after Alabama and Mississippi later enacted legislation specifically addressing buyer-agreement timing, further demonstrating that such timing restrictions are not inherent in the Louisiana statute itself.

86. Plaintiffs further allege that Defendants' breach caused direct injury to Plaintiffs by forcing them to choose between violating the association's false interpretation of state law or violating the actual state law. Plaintiffs allege that as members or former members, they relied on

66

Defendants' representations regarding legal requirements and were compelled to adopt business practices—including mandatory pre-showing buyer agreements—that created conflicts with their ethical obligations, their independent contractor status, and their professional judgment. Plaintiffs allege that this breach injured members by subjecting them to potential legal liability, ethical violations, and the loss of business opportunities, as Plaintiffs could not in good conscience enforce the stricter standards Defendants falsely claimed were required by Louisiana law. Plaintiffs allege that the contractual breach is inseparable from the antitrust injury, as Defendants used their control over essential MLS access to enforce the misrepresented requirements, thereby coercing members into compliance with association rules that exceeded actual state law mandates.

    a.  **EXHIBIT E** – ROAM MLS Fines and Sanctions for Buyer Representation Agreement Violations: Plaintiffs further allege that Exhibit E consists of ROAM MLS rules and administrative sanction schedules establishing automatic fines and penalties for violations of buyer representation agreement requirements. Plaintiffs further allege that the document classifies "Buyer Representation Agreement Violations" as violations of NAR Policy 8.13 (ROAM Section 5.0.2), which requires that a written buyer agreement be in place **prior** to touring a home. Plaintiffs further allege that Exhibit E provides that a first offense results in a $1,000 fine, a second offense results in a $2,500 fine, and a third offense results in the suspension of the Participant's or Subscriber's MLS access for ninety (90) days, with reporting of the violation to the Louisiana Real Estate Commission. Plaintiffs further allege that these sanctions are described as "Administrative Sanctions" that are automatic and applied to a participant's account pursuant to

ROAM rules and regulations. Plaintiffs further allege that the exhibit further includes a citation provision stating that a violation includes the "failure to enter into a written agreement with the buyer **prior** to touring a home," thereby imposing enforceable penalties tied specifically to pre-showing buyer agreement requirements.

87. Plaintiffs further allege that Exhibit E demonstrates that Defendants did not merely provide guidance or interpretation of Louisiana law, but instead imposed automatic financial penalties and the threat of suspension of MLS access to compel compliance with a pre-showing buyer agreement requirement, thereby forcing Plaintiffs to choose between adhering to Defendants' enforced interpretation or risking fines, discipline, and loss of access to essential MLS-linked services.

88. Plaintiffs allege that Defendants' failure to provide accurate information regarding state law---as evidenced by the false representations in Exhibit M contradicted by Exhibits G and S---constitutes a material breach of the membership agreement's implied covenant of good faith and fair dealing.

89. Plaintiffs further allege that the challenged restraint excludes, burdens, and materially disadvantages otherwise qualified professionals who are licensed by the State of Louisiana to perform the same underlying real-estate and appraisal-related functions as Defendants' members, but who seek to compete without compelled association membership or who seek narrower, lawful, and commercially reasonable access to the MLS-linked product.

90. Plaintiffs further allege that Defendants have repeatedly treated the MLS-linked product as separately billed, separately governed, and operationally distinct while simultaneously refusing to provide it on neutral, standalone terms.

91. Plaintiffs further allege that, to the extent Defendants' own published policies, pricing schedules, participation terms, or representations create expectations concerning access, billing, or the nature of the product offered, Defendants' conduct in conditioning, restricting, suspending, or recharacterizing access contrary to those representations further supports Plaintiffs' state-law and contract-related claims, which are separately asserted herein.

**K: ANTITRUST INJURY & CONSUMER HARM**

**K1 : Injury to Competition**

92. Plaintiffs further allege that Defendants' conduct has caused and continues to cause antitrust injury, including injury to competition itself, by excluding nonmember or dissenting market participants, increasing costs, reducing independent brokerage choice, raising barriers to entry, reducing competitive output, distorting the dissemination of listing and sold-price information, impairing appraisal and valuation accuracy, and causing downstream harm to buyers, sellers, appraisers, lenders, and the consuming public who depend on accurate, timely, and broadly available market information.

**K2. Consumer Harm**

93. Plaintiffs further allege that the challenged restraints increase the costs of market participation by forcing the purchase and maintenance of unwanted memberships and related charges as a condition of access to the dominant local listing-data platform, and that those increased costs

are naturally passed through, in whole or in part, into the cost structure of brokerage, appraisal, valuation, and related real-estate services ultimately borne by consumers. Plaintiffs further allege that sellers are harmed when their listings receive reduced exposure, reduced showing access, reduced visibility, reduced dissemination, or impaired interoperability because of Defendants' control over the dominant listing-data ecosystem and related downstream pathways. Plaintiffs further allege that buyers are harmed when inventory visibility, pricing transparency, showing access, and market information are reduced, delayed, or distorted by the challenged restraints. Plaintiffs further allege that appraisals and financing are harmed when access to accurate and complete comparable-sales data, sold-price data, listing history, and related valuation information is restricted, degraded, or distorted. Plaintiffs further allege that the challenged restraints impair accurate price discovery in the residential real-estate market and thereby distort consumer expectations and transactional decision-making.

94. Plaintiffs further allege that Defendants' conduct harms not only Plaintiffs as individual market participants, but also competition and consumers more broadly by increasing costs, reducing independent brokerage choice, raising barriers to entry, excluding nonmember competitors, reducing competitive output, distorting the dissemination of listing and sold-price information, impairing appraisal and valuation accuracy, and restricting visibility and showing interoperability for listings associated with noncompliant or disfavored participants.

**K3: Network Effects and Downstream Harm**

95. Plaintiffs further allege that the challenged conduct reduces transparency by enabling distortions in public-facing listing visibility, sold-price visibility, and downstream

dissemination, including omissions that can leave consumers with inaccurate or incomplete impressions of actual transaction outcomes and market value. Plaintiffs further allege that where sold prices are omitted from public-facing displays after listings are marked sold, consumers may rely on stale or incomplete pricing signals, and automated or consumer-facing valuation estimates may be distorted by incomplete transaction transparency. Plaintiffs further allege that such distortions can affect seller expectations, buyer expectations, comparative market analyses, appraisal review, underwriting assumptions, and the general transparency of the residential real-estate market.

a. **EXHIBIT A6 – 1489 S Columbine Street (Sold Price Omitted from Public-Facing Sites):** Plaintiffs further allege that Exhibit A6 consists of screenshots from **realtor.com** and **Zillow** for the property located at **1489 S Columbine St., Baton Rouge, Louisiana 70808**, listed through ROAM MLS under **MLS #2024009194**. Plaintiffs further allege that the screenshots reflect listing history, listing price information, property details, and status changes, and further reflect that the property sold on or about **June 24, 2024**, but show the sold price as **"Not disclosed"** or otherwise blank on the public-facing display.

b. **EXHIBIT B1 – 1019 Jason Drive (Sold Price Omitted from Public-Facing Sites):** Plaintiffs further allege that Exhibit B1 consists of screenshots from **realtor.com** and **Zillow** for the property located at **1019 Jason Dr., Denham Springs, Louisiana 70726**, listed through ROAM MLS under **MLS #2024010459**. Plaintiffs further allege that the screenshots reflect listing price information, listing status, and a July 2024 sale date, but reflect the sold price as blank, omitted, or not publicly displayed on the public-facing listing.

c. **EXHIBIT B2 – 8175 Fairlane Drive (Sold Price Omitted from Public-Facing Sites):** Plaintiffs further allege that Exhibit B2 consists of screenshots from **realtor.com** and **Zillow** for the property located at **8175 Fairlane Dr., Denham Springs, Louisiana 70726**, listed through ROAM MLS under **MLS #2024002750**. Plaintiffs further allege that the screenshots reflect listing history, including listing-price changes and days on market, and further reflect that the property sold in **July 2024**, but show the sold price as **"Not disclosed"** or otherwise omitted on the public-facing display.

d. **EXHIBIT B3 – 9602 Prytania Avenue (Sold Price Omitted from Public-Facing Sites):** Plaintiffs further allege that Exhibit B3 consists of screenshots from **realtor.com** and **Zillow** for the property located at **9602 Prytania Ave., Baton Rouge, Louisiana 70809**, listed through ROAM MLS under **MLS #2023010628**. Plaintiffs further allege that the screenshots reflect an extended listing period, listing-price changes, and that the property sold in **June 2024**, but show the sold price as **"Not disclosed"** or otherwise blank on the public-facing display.

e. **EXHIBIT B4 – 5000 McHugh Drive (Sold Price Omitted from Public-Facing Sites):** Plaintiffs further allege that Exhibit B4 consists of screenshots from **realtor.com** and **Zillow** for the property located at **5000 McHugh Dr., Zachary, Louisiana 70791**, listed through ROAM MLS under **MLS #2023019325**. Plaintiffs further allege that the screenshots reflect listing history, listing-price reductions, property details, and that the property sold in **June 2024**, but show the sold price as **"Not disclosed"** or otherwise blank on the public-facing display.

96. Plaintiffs further allege that the public-facing displays reflected in Exhibits A6, B1, B2, B3, and B4 do not simply omit the transaction entirely; rather, they continue to display that the property sold, along with listing history and related transaction details, while withholding the actual sold price itself, which is the most critical and widely relied-upon data point for determining market value in residential real-estate transactions. Plaintiffs further allege that because consumers commonly rely on high-traffic public-facing real-estate websites such as Zillow, Realtor.com, Homes.com, and similar MLS-fed platforms to evaluate affordability, compare properties, and understand neighborhood market trends, withholding the sold price while continuing to display the fact of sale creates a materially misleading and incomplete public record that distorts consumers' ability to assess actual market value.

97. Plaintiffs further allege that the public-facing displays reflected in Exhibits A6, B1, B2, B3, and B4 do not simply omit the transaction entirely; rather, they continue to display that the property sold, along with listing history and related transaction details, while withholding the actual sold price itself, which is the most critical and widely relied-upon data point for determining market value in residential real-estate transactions.

98. Plaintiffs further allege that because consumers commonly rely on high-traffic public-facing real-estate websites such as Zillow, Realtor.com, Homes.com, and similar MLS-fed platforms to evaluate affordability, compare properties, and understand neighborhood market trends, withholding the sold price while continuing to display the fact of sale creates a materially misleading and incomplete public record that distorts consumers' ability to assess actual market value.

99. Plaintiffs further allege that because these public-facing platforms often continue to display the last listed price even while withholding the actual sold price, any automated estimate,

73

algorithmic valuation, comparative-market display, or consumer-facing price analysis that relies in whole or in part on that incomplete data may generate a distorted or inaccurate estimate of market value based on stale, incomplete, or misleading pricing inputs.

100.    Plaintiffs further allege that this selective disclosure practice is relevant not only to consumer harm, but also to antitrust injury because Defendants' control over the dominant MLS-linked data pipeline allows Defendants to determine not only who receives practical access to market information, but also what portions of that information are publicly disseminated, withheld, or degraded in the downstream consumer marketplace.

    a.  **EXHIBIT D6 – Federal Trade Commission Advertising FAQs (Material Omissions):** Plaintiffs further allege that Exhibit D6 consists of the Federal Trade Commission's publication titled **"Advertising FAQs: A Guide for Small Business."** Plaintiffs further allege that the publication states that advertising must be truthful and non-deceptive, that an advertisement can be deceptive if it omits information likely to mislead consumers and that is material to a consumer's decision, that price is material information, that disclosures should be clear and conspicuous, and that fine print or other disclosures should not be used to contradict or cure misleading impressions created by the main message.

101.    Plaintiffs further allege that the facts reflected in Exhibit D6 are consistent with Plaintiffs' allegation that suppression or omission of material pricing and compensation information in public-facing real-estate marketing can mislead consumers, impair informed decision-making, and lessen competition in the residential real-estate market.

**V : FAIR HOUSING / DISPARATE IMPACT / STEERING / HOUSING ACCESS ALLEGATIONS**

74

102.    Plaintiffs further allege that the challenged buyer-side rule structure, compensation-suppression practices, and coordinated MLS-linked restrictions materially burden fair and equal access to housing by reducing transparency, increasing hidden and selectively applied costs, and disproportionately impairing the ability of financially constrained buyers to meaningfully view, pursue, and acquire residential properties in the affected Louisiana housing markets.

103.    Plaintiffs further allege that, under the challenged rule structure as imposed, promoted, and/or enforced by Defendants and the association-controlled MLS-linked system, buyers are widely led to believe, and in many transactions are practically required, to enter into a written buyer-representation agreement, buyer-compensation agreement, and/or similar binding buyer contract before being permitted to tour, view, or otherwise meaningfully participate in the home-shopping process. Plaintiffs further allege that Defendants, affiliated associations, and/or the ROAM-linked MLS structure have publicly promoted, represented, and/or enforced the rule in a manner that leads consumers and licensees to believe that a binding buyer agreement is legally required before a buyer may view a home, and that agents who do not obtain such an agreement before a showing may be subject to fines, MLS discipline, and/or suspension.

104.    Plaintiffs further allege that Louisiana law itself does not clearly require that every buyer sign a binding buyer-representation agreement merely to view a property, but instead has been publicly described by Defendant associations and related entities in a broader manner that has contributed to consumer confusion and to an industry environment in which many consumers and licensees are led to believe that a binding contract is legally mandatory before a home may be shown. Plaintiffs further allege that such confusion and overbroad enforcement

materially burden housing access, particularly where buyers may reasonably believe they must commit contractually to compensation-bearing agreements before they can even view available housing.

105.    Plaintiffs further allege that, at the same time Defendants and/or the association-controlled MLS-linked system require buyers to enter into compensation-bearing agreements before viewing homes, Defendants also prohibit the amount of seller-offered buyer-broker compensation from being broadly and transparently communicated through the dominant MLS-linked public marketing channels, including IDX feeds and high-traffic consumer-facing websites that receive the greatest volume of buyer attention. Plaintiffs further allege that the combined effect of these rules is to force buyers, as a practical matter, to sign a binding compensation-related agreement before they can meaningfully know whether a seller is willing to contribute to or pay any buyer-broker compensation, while also depriving buyers of a transparent, neutral, and broadly accessible source through which such information can be uniformly reviewed before a showing or before the buyer becomes contractually obligated.

106.    Plaintiffs further allege that this structure materially impairs informed housing choice because many buyers cannot realistically evaluate the affordability of representation, the true cost of pursuing a particular home, or whether a home remains economically attainable without first knowing whether seller-paid compensation is available. Plaintiffs further allege that these burdens fall most heavily on lower-income, cash-constrained, first-time, and credit-limited buyers, including buyers relying on low-down-payment, down-payment-assistance, or 100% financing programs, because such buyers frequently lack available cash reserves to separately pay a buyer's broker if a seller refuses to pay or offers less than the amount required under the buyer agreement.

76

107.    Plaintiffs further allege that the challenged structure therefore makes housing opportunities less available, less transparent, and less attainable for buyers least able to absorb additional transaction costs, thereby creating a disparate impact on access to housing. Plaintiffs further allege that, in many Louisiana residential markets, lower-income and credit-constrained households are disproportionately represented among households protected under federal and/or state fair housing laws, such that policies that predictably burden buyers who cannot readily absorb undisclosed or selectively imposed representation costs foreseeably and disproportionately impair access to housing opportunities for protected-class households as well.

108.    Plaintiffs further allege that sellers who wish to offer cooperative or seller-paid buyer-broker compensation, and who wish to broadly advertise that fact to attract buyers and improve affordability, are deprived of the ability to communicate that information through the dominant MLS-linked public distribution channels used by the public, including IDX feeds and major consumer-facing websites. Plaintiffs further allege that a seller's willingness to contribute to buyer representation costs is material information affecting affordability, access, and housing choice, particularly for financially constrained buyers, and that the challenged rule structure suppresses the broadest and most efficient market-wide communication of that information.

109.    Plaintiffs further allege that the suppression of seller-offered buyer-broker compensation from the dominant MLS-linked public distribution channels, and the absence of any neutral, consistent, and publicly reviewable location where such compensation is uniformly disclosed, creates conditions that increase the risk of discriminatory treatment in housing transactions and make such discrimination materially harder to detect or prove. Plaintiffs further allege

77

that, under the prior structure, seller-offered cooperative compensation was more transparent and more uniformly ascertainable, whereas under the challenged rule structure a seller may selectively agree or refuse to pay buyer-broker compensation after a particular buyer, offer, or buyer profile is known. Plaintiffs further allege that this creates conditions in which selective, inconsistent, or discriminatory treatment may occur with reduced transparency and reduced detectability, while leaving no consistent public-facing record by which such differential treatment can be readily identified, compared, or challenged.

110.    Plaintiffs further allege that, upon information and belief, certain in-house brokerage systems, internal brokerage platforms, same-brokerage transaction environments, and/or internal office practices may still allow affiliated brokers or agents to know, infer, or access seller-offered buyer-broker compensation information within their own firms or internal systems, even while such information is withheld from broader MLS-linked public channels and from competing outside buyer representatives. Plaintiffs further allege that this unequal access to compensation information creates an informational advantage and conditions conducive to steering, because a brokerage or agent with advance knowledge of how much of a buyer's representation cost may be covered by the seller can advise, direct, or influence buyer behavior differently than competing agents who lack that information before an offer is written.

111.    Plaintiffs further allege that these harms are not reasonably necessary to achieve any legitimate, pro-competitive, consumer-protective, or fair-housing-consistent objective because any legitimate interest in transparency, lawful brokerage practice, or orderly transaction management can be achieved through substantially less restrictive and less discriminatory means, including transparent and neutral disclosure practices, equal-access information rules,

and requiring written agreements only at or before the point actually required by applicable state law rather than as a precondition to viewing homes.

a. **EXHIBIT G** – Louisiana Act No. 690 (Buyer Agreement Statute): Plaintiffs further allege that Exhibit G consists of Louisiana Act No. 690, enacted in 2024, which added a written buyer-agreement requirement to Louisiana law. Plaintiffs further allege that the enacted statute requires a written agreement between a broker and a buyer, but does not expressly state that such agreement must be signed before a buyer may tour or view a home.

b. **EXHIBIT S** – Louisiana Real Estate Commission Minutes Regarding Timing of Buyer Agreement Requirement: Plaintiffs further allege that Exhibit S consists of Louisiana Real Estate Commission meeting minutes dated August 15, 2024. Plaintiffs further allege that the minutes reflect discussion of Act No. 690 and state that the Act requires a written buyer agreement but "does not specifically mention the timing of that requirement."

c. **EXHIBIT M** – GBRAR Member Communication Regarding Buyer Agreement Before Viewing: Plaintiffs further allege that Exhibit M consists of a GBRAR communication distributed to agents and/or brokers stating that buyers must sign a buyer agreement **before** viewing a home and describing that requirement as being required under Louisiana law and/or by action of the Governor. Plaintiffs further allege that the communication reflects that this requirement was presented to market participants as a legal obligation before a showing.

d. **EXHIBIT K** – DOJ Statement of Interest / Public Reporting Regarding Buyer Agreement Concerns: Plaintiffs further allege that Exhibit K consists of a news

79

article or public reporting referencing the United States Department of Justice's concerns regarding mandatory buyer agreements and related competitive effects in residential real-estate transactions.

e.  **EXHIBIT N** – Louisiana REALTORS® Chart Omitting Timing Limitation Context: Plaintiffs further allege that Exhibit N consists of a Louisiana REALTORS® chart or summary concerning post-settlement buyer-broker compensation and related rules. Plaintiffs further allege that the chart identifies certain rule changes but omits the fact that Louisiana law does not expressly require that a buyer agreement be signed before viewing a home, despite the significance of that issue to agents, brokers, and consumers.

f.  **EXHIBIT Z9** [9]– Restriction on Public Syndication of Seller-Offered Buyer-Broker Compensation: Plaintiffs further allege that Exhibit Z9 consists of rule language and/or policy materials reflecting that seller-offered buyer-broker compensation may **not** be displayed through public-facing syndicated listing channels, including consumer-facing websites receiving MLS-linked data feeds.

g.  **EXHIBIT A4** – Fair Housing and Advertising Guidance Regarding Transparency, Uniform Messaging, and Equal Access to Fee or Concession Information: Plaintiffs further allege that Exhibit A4 consists of a document titled "Fair Housing and Advertising Concessions or Fees." Plaintiffs further allege that the document states that if a property advertisement includes a price subject to concessions or brokerage fees, such information should be clearly stated, and that misleading or ambiguous pricing can lead to accusations of deceptive practices.

---

[9]
https://www.justice.gov/atr/case-document/memorandum-united-states-opposition-defendants-motion-dismiss-0

Plaintiffs further allege that the document further states that any mention of concessions or fees should be presented uniformly across advertisements to avoid appearing preferential or discriminatory, and that all potential buyers should have equal access to information about concessions and fees, including through listings available in diverse media.

112.    Plaintiffs further allege that these exhibits provide factual support for Plaintiffs' allegations that the challenged rule structure reduces transparency, creates confusion concerning when buyers must become contractually bound, suppresses broad public communication of seller-paid buyer-broker compensation, and removes a consistent public-facing record by which compensation practices may be uniformly reviewed, compared, or challenged. Plaintiffs further allege that these conditions can materially burden housing access for financially constrained buyers and make steering, selective treatment, or discriminatory effects more difficult to detect or prove.

## VI. DEFENDANT KENNETH DAMANN'S PERSONAL PARTICIPATION IN THE CHALLENGED CONDUCT

113.    Plaintiffs further allege that Defendant Kenneth Damann is not named solely by virtue of title, employment status, or nominal association with GBRAR and/or ROAM, but because Plaintiffs allege specific facts showing his direct personal participation in the challenged conduct at issue in this action.

   a.    **EXHIBIT P** consists of a LinkedIn profile identifying Kenneth Damann as "Executive Vice President, GBRAR." Plaintiffs further allege that the profile

states that he is an "experienced executive" with a demonstrated history in the real-estate industry and identifies skills including "Multiple Listing Service," "Databases," "Real Estate Transactions," and related operational functions. Plaintiffs further allege that Exhibit P reflects that Mr. Damann held a senior executive role at GBRAR during the period relevant to the allegations in this action.

b. **EXHIBIT C6** consists of a Louisiana Secretary of State Commercial Division record for ROAM MLS LLC. Plaintiffs further allege that the record identifies ROAM MLS LLC as an active Louisiana limited liability company with a registration date of May 12, 2021, and lists its domicile and mailing address as 14101 Perkins Road, Baton Rouge, Louisiana 70810. Plaintiffs further allege that the record identifies Kenneth Damann as the registered agent for ROAM MLS LLC, with an appointment date of April 13, 2022. Plaintiffs further allege that the same record lists Greater Baton Rouge Association of Realtors, Inc. as a member of ROAM MLS LLC, along with other REALTOR® association entities, including New Orleans Metropolitan Association of Realtors, Inc., Bayou Board of Realtors, Inc., Greater Central Louisiana Realtors Association, Inc., and Realtor Association of Acadiana.

c. **EXHIBIT  C7** consists of a Louisiana Secretary of State Commercial Division record for Greater Baton Rouge Association of Realtors, Inc. Plaintiffs further allege that the record identifies GBRAR as an active Louisiana non-profit corporation with a registration date of June 14, 1941, and lists its domicile address as 14101 Perkins Road, Baton Rouge, Louisiana 70810. Plaintiffs further allege

82

that the record lists Kenneth Damann as GBRAR's registered agent, with an appointment date of May 31, 2016. Plaintiffs further allege that the same record also identifies Kenneth Damann as an officer of GBRAR with the title "Executive Vice-President."

114.   Plaintiffs further allege that Exhibits C6 and C7 are official public records that independently corroborate Kenneth Damann's formal legal and operational roles in both GBRAR (non profit) and ROAM MLS LLC during the relevant period, including his status as registered agent for each entity and his officer role at GBRAR.

   a. **EXHIBIT C9** consists of an email chain dated July 31, 2024 through August 2, 2024 regarding "MLS membership," in which Plaintiff Carla DeYoung inquired about affiliate membership, appraisal-related access, and whether she could obtain MLS access or board membership without National Association of REALTORS® membership. Plaintiffs further allege that the email chain reflects that GBRAR staff member Tracy Fletcher stated that appraisers and real-estate agents who hold licenses "join as a broker and pay fees just as our realtor broker members pay," that appraisers and real-estate agents "have licenses so they join to become Realtors and have access to MLS and pay association dues," and that affiliate members "do not have access to MLS."

   b. **EXHIBIT C9** further reflects that Ms. Fletcher forwarded Plaintiff's request to Kenneth Damann and advised Plaintiff that she had "included Ken on this email" and that Plaintiff could send her questions and concerns to him directly. Plaintiffs further allege that, in the same exhibit, Kenneth Damann responded by email on August 1, 2024, stating: "You can be REALTOR Members of GBRAR without

being members of the MLS. You cannot be a member of just a local or state association without being a member of the National. Currently, ROAM MLS is a service that is only available to REALTOR Members. The ROAM Board of Managers has discussed and will continue to discuss the option of making it available to non-REALTORS, but no decision has yet been made to implement that change." Plaintiffs further allege that this communication reflects Mr. Damann's direct involvement in communicating and enforcing the challenged three-way membership structure and the membership-linked limitation on ROAM MLS access.

c. **EXHIBIT C9** also reflects that Plaintiff specifically requested a narrower, lawful alternative by asking whether she could withdraw Tigreland Properties and its agents and sign up under her appraisal business as an appraiser, while not being a member of NAR, because she needed access to property disclosures, set appointments, and pull sales data for appraisal work. Plaintiffs further allege that, in response, GBRAR staff stated that Plaintiff could join as her appraiser office, but that "your fees will just as they are now and this means you will be paying NAR fees," thereby reflecting that even appraisal-related access was still conditioned on compelled NAR-linked membership and fees.

d. **EXHIBIT C9** additionally reflects that, after Plaintiff asked what Kenneth Damann meant by his statement that "MLS membership is granted to individuals," Mr. Damann responded on August 2, 2024 that "the actual MLS Participant (Member) is an individual person, not a firm or an organization." Plaintiffs further allege that, when Plaintiff then explained that she did not want to

be part of NAR as a broker or REALTOR® and was seeking to perform work through her appraisal company without paying broker fees tied to the existing structure, Mr. Damann responded on August 2, 2024 that it was "entirely up to you whether you want to be a REALTOR," that this was an "independent business decision," and that GBRAR "cannot provide you with an exemption to the existing established pricing or policy." Plaintiffs further allege that these statements show that Mr. Damann personally communicated the refusal to provide a requested exemption or neutral alternative to the challenged membership-linked access structure.

e.  **EXHIBIT D5** consists of a January 13, 2025 forwarded email chain containing an August 19, 2024 exchange regarding "Board Membership." Plaintiffs further allege that, in that exchange, Tammy Jo Williams asked Kenneth Damann whether the board had made a decision "to allow non-NAR members, be apart of GBRAR." Plaintiffs further allege that Kenneth Damann responded on August 19, 2024: "It is not possible to be a member without being a member of NAR. You cannot be a REALTOR without being a member of all 3 — local, state and national associations. That is the definition of REALTOR membership. That is not something that is up to any local board of directors to be able to change." Plaintiffs further allege that this communication reflects Mr. Damann's direct personal communication that local-only or non-NAR membership was not being permitted and that the three-way membership requirement would continue to be enforced.

f. **EXHIBIT Z1** – NAR Policy Statement 7.25 (Notice and Coordination Upon Demand for MLS Access Without Association Membership): Plaintiffs further allege that Exhibit Z1 consists of a page from NAR's policy materials titled "Procedures to Be Followed by an Association of REALTORS® Upon Demand for Access to the Association's Multiple Listing Service without Association Membership (Policy Statement 7.25)." Plaintiffs further allege that the policy states that, in states other than California, Georgia, Alabama, and Florida, when an association is confronted with a request or demand for access to the association's MLS without association membership, member associations are advised to immediately notify both the state association and NAR's Member Policy Department and obtain recommended procedures and assistance. Plaintiffs further allege that Exhibit Z1 is consistent with Plaintiffs' allegation that requests such as Carla DeYoung's were not treated as ordinary local administrative matters, but instead were subject to a broader REALTOR®-affiliated policy structure requiring notice and coordination beyond the local board. Plaintiffs further allege that Kenneth Damann was the individual who communicated with Carla DeYoung regarding the denial of access and the governing policy framework, and Plaintiffs therefore allege that it is reasonable to infer that Mr. Damann knew of, participated in, and/or helped carry out the notice, escalation, and coordination procedures contemplated by Policy Statement 7.25 in connection with Plaintiffs' request for MLS access without full association membership.

g. Plaintiffs further allege that GBRAR published and/or distributed member-facing guidance concerning the NAR settlement and Louisiana's enacted

buyer-agreement legislation (originally introduced as House Bill 366 and later enacted as Act No. 690) stating that a buyer broker agreement was required before a home tour, even though the enacted Louisiana law requires execution of a buyer agreement between a broker and a buyer but does not expressly state that such agreement must be signed before touring or viewing a home. Plaintiffs further allege that the Louisiana Real Estate Commission's August 15, 2024 meeting minutes reflect that, in discussing Act No. 690, the Commission's legal and legislative report stated that the Act "does not specifically mention the timing of that requirement." Plaintiffs further allege, upon information and belief, that Mr. Damann, by virtue of his senior executive and operational authority within GBRAR, participated in, approved, maintained, ratified, and/or oversaw GBRAR's dissemination of such guidance.

115. Plaintiffs further allege that, on December 23, 2024, Kenneth Damann personally participated in and/or was a principal speaker at a meeting in which GBRAR's ownership interest in ROAM and a proposed holding-company restructuring were discussed.

116. Plaintiffs further allege that **Exhibit C4** consists of transcript excerpts and/or recording-derived transcript materials from that December 23, 2024 meeting, obtained from a broker who attended, and that **Exhibit C5** consists of a photograph of the structure diagram presented or displayed at the same meeting, obtained from another broker who attended.

117. Plaintiffs further allege that the transcript excerpts reflected in **Exhibit C4** identify Mr. Damann as the first and principal speaker during the discussion of the proposed restructuring.

    a. **EXHIBIT C4**, Mr. Damann stated during the December 23, 2024 meeting that "the ownership that GBRAR has in ROAM MLS" could be placed under the

87

proposed holding company, and that ownership interests in other affiliated entities could likewise be placed under the holding company. Plaintiffs further allege that, as reflected in Exhibit C4, Mr. Damann explained that the purpose and effect of the restructuring was that separate "lines of operational business fundamentally become silent" or "become silos," and further stated that if "the MLS world absolutely blew up" or "the MLS got put out of business for whatever reason," that silo could go away while "GBRAR is still functioning as GBRAR." Plaintiffs further allege that Exhibit C4 also reflects discussion that the proposed restructuring involved amendments to GBRAR's Articles of Incorporation and the creation of Articles of Incorporation for the holding company.

b. **EXHIBIT C5** depicts a hand-drawn or meeting-presented structure diagram showing GBRAR on one side with related entities, including ROAM MLS, and a proposed "Holding Co." structure on the other side with separate vertical divisions, including GBRAR and other entities, consistent with the restructuring discussed in Exhibit C4.

118. Plaintiffs further allege that Exhibits C4 and C5, when read together, reflect that Mr. Damann personally participated in the communication, explanation, and proposed structural separation of GBRAR's ROAM-related ownership interests and related operational entities.

119. Plaintiffs further allege that Defendant Damann's statements regarding "the ownership that GBRAR has in ROAM MLS," the proposed placement of that ownership under a holding-company structure, and the discussion that the MLS-related "silo" could "go away" while GBRAR continued to function are additional facts showing that Mr. Damann personally

88

participated in discussions concerning the ownership, structure, and potential separation of the ROAM-related operations at issue in this action.

120. Plaintiffs further allege that Mr. Damann's communications and conduct were not isolated, incidental, or merely ministerial. Rather, Plaintiffs allege that Mr. Damann personally addressed Plaintiffs' requests for MLS-related access without compulsory REALTOR® membership, personally communicated that ROAM MLS access was available only to REALTOR® members, personally stated that local leadership could not waive or alter the three-way membership requirement, personally refused to provide an exemption even where Plaintiffs sought access for appraisal-related functions rather than listing-entry privileges, and later personally participated in discussions concerning GBRAR's ownership interest in ROAM and the proposed structural separation or restructuring of the ROAM-related operations.

121. Plaintiffs allege these facts to show Defendant Kenneth Damann's individual involvement and personal participation in the challenged conduct, including where he acted in a representative capacity on behalf of GBRAR and/or ROAM. Plaintiffs further allege that Mr. Damann is not named merely because of title, employment status, or nominal association with GBRAR and/or ROAM, but because he personally communicated, maintained, enforced, approved, ratified, and/or participated in the challenged membership-linked access restrictions and related ROAM/GBRAR operational structure at issue in this action.

122. Personal liability under the antitrust laws does not arise merely from corporate title, but it does attach where a corporate officer knowingly participates in effecting the unlawful contract, combination, or conspiracy, even when acting in a representative capacity. United States v. Wise, 370 U.S. 405, 416 (1962).

123.    Plaintiffs further allege that, upon information and belief and as specifically alleged herein, Defendant Kenneth Damann knowingly and personally participated in effecting, authorizing, directing, communicating, implementing, maintaining, ratifying, approving, and/or enforcing the challenged access restrictions, participation requirements, exclusionary practices, and related conduct at issue in this action, and is therefore named as a Defendant based on his own alleged conduct and participation rather than by virtue of title alone.

## VII.  REPUTATIONAL HARM TO PLAINTIFFS AND SIMILARLY SITUATED LICENSED PROFESSIONALS

124.    Plaintiffs further allege that Defendants' conduct has caused reputational harm to Plaintiffs and similarly situated licensed real-estate professionals because the National Association of REALTORS® ("NAR") and affiliated REALTOR® organizations have generated widespread negative publicity concerning alleged anticompetitive conduct, forced membership, excessive dues extraction, organizational misconduct, and consumer-harming policies, while the consuming public commonly uses and understands the term "Realtor" as a general reference to real-estate agents and brokers without distinguishing between trademarked REALTOR® membership and non-REALTOR® licensed professionals. Plaintiffs further allege that, as a result, negative publicity directed at NAR and REALTOR®-affiliated organizations foreseeably spills over onto Plaintiffs' professional reputation, credibility, and client relationships even where Plaintiffs objected to, did not control, and did not endorse the challenged conduct.

a. **EXHIBIT A7** – Inman Article Regarding NAR Negative Publicity and Bundled Membership Criticism: Plaintiffs further allege that Exhibit A7 consists of a December 13, 2024 Inman article titled "Another NAR bombshell reflects financial waste, hypocrisy," authored by Cara Ameer. Plaintiffs further allege that the article states that the National Association of REALTORS® "owes its members an apology," describes NAR as an organization to which agents "largely have no choice" but to belong because membership is "bundled with our local and state Realtor association dues," and states that "we are reminded of an organization that has failed our industry on multiple levels." Plaintiffs further allege that the article further states that NAR's dues have "subsidized excessive and unnecessary expenditures" and advocates that agents should be permitted to "opt out of membership" and that NAR, state, and local dues should be "decoupl[ed]."

b. **EXHIBIT B7** – New York Times Article Regarding NAR Public Controversy, Mandatory Dues Structure, and Industry Reputation: Plaintiffs further allege that Exhibit B7 consists of a November 18, 2024 New York Times article titled "Chauffeured Cars and Broadway Tickets: Inside the National Realtors Group." Plaintiffs further allege that the article describes the National Association of REALTORS® as the country's largest trade group, states that it has "for a century has dominated the American housing industry, policing access to home listings and setting rules about commissions," and states that "most real estate agents cannot effectively do their jobs without access to these databases." Plaintiffs further allege that the article states that NAR had approximately 1.5 million

members, that "to be a member, every Realtor in the United States must pay a bundle of dues," and that members had begun filing legal challenges alleging that the bundled local, state, and national membership requirement constituted antitrust violations or "forced membership." Plaintiffs further allege that the article also states that prior commission litigation had "battered the organization's reputation and deflated its influence."

125.    Plaintiffs further allege that Exhibits A7 and B7 provide factual support for Plaintiffs' claim that the challenged conduct has caused reputational harm extending beyond internal association disputes and into the broader marketplace. Plaintiffs further allege that widespread public and industry reporting concerning NAR's alleged anticompetitive conduct, compulsory bundled dues structure, and related organizational misconduct has foreseeably damaged the reputation of licensed real-estate professionals generally, including Plaintiffs, because consumers commonly do not distinguish between REALTOR®-affiliated organizations, trademarked REALTOR® membership, and non-REALTOR® licensed professionals when evaluating the integrity of real-estate practitioners.

126.    Plaintiffs further allege that, in ordinary consumer usage, the term "Realtor" is frequently used as a generic label for real-estate agents and brokers regardless of whether a professional is in fact a member of NAR or any affiliated REALTOR® association. Plaintiffs further allege that this widespread public confusion or imprecision causes negative publicity directed at NAR and REALTOR®-affiliated organizations to spill over onto non-REALTOR® licensed professionals, including Plaintiffs, who neither controlled nor endorsed the challenged conduct, but whose profession, credibility, and client trust are nevertheless affected by the resulting public narrative.

## VIII. DAMAGES TO PLAINTIFFS, INCLUDING REPUTATIONAL HARM, LOSS OF GOODWILL, AND EMOTIONAL DISTRESS

127.    Plaintiffs further allege that Defendants' challenged conduct has caused and continues to cause direct injury to Plaintiffs' business and property, including, without limitation, compelled or threatened compelled payments, denial or restriction of neutral access to MLS-linked data and participation functions, reduced visibility and participation, impaired ability to compete on equal terms, lost business opportunities, reduced access to critical market data and tools, increased compliance burdens, and the loss or material impairment of present and future competitive opportunities.

128.    Plaintiffs further allege that Defendants' conduct has also caused substantial reputational harm and loss of goodwill. Plaintiffs allege that public confusion between licensed Louisiana real estate professionals and REALTOR® association members, negative publicity surrounding REALTOR®-controlled rules and policies, and the practical inability of many consumers to distinguish between Defendants' association-imposed requirements and actual state-law requirements have harmed Plaintiffs' professional reputation, business identity, and standing in the marketplace.

129.    Plaintiffs further allege that Defendants' conduct has also caused significant emotional distress and related non-economic harm as a foreseeable result of the challenged restraints, coercive pressures, and ongoing interference with Plaintiffs' livelihoods and professional judgment. Plaintiffs allege that Defendants' control over essential MLS-linked data, visibility, showing access, and related market-participation functions forced Plaintiffs to spend substantial time and effort attempting to identify substitute products, workarounds, and alternative systems that could replicate the practical functionality of Defendants' controlled

access, only to find that such substitutes were not realistically available or could not function effectively without access to the concentrated listing inventory, historical data, participant network, and related permissions controlled through Defendants' structure.

130.    Plaintiffs further allege that this inability to obtain workable substitutes, combined with the pressure to either submit to unwanted rules and compelled memberships or compete at a severe disadvantage, caused ongoing stress, anxiety, frustration, humiliation, uncertainty, disruption of Plaintiffs' businesses, and emotional distress. Plaintiffs further allege that these harms were a foreseeable consequence of Defendants' alleged conduct because the challenged structure did not merely increase costs, but materially interfered with Plaintiffs' ability to practice their professions, serve clients, maintain independence, and preserve their livelihoods on lawful and ethical terms.

131.    Plaintiffs further allege that the difficulty of precise quantification does not negate the reality, materiality, or ongoing nature of the injury to Plaintiffs' business, property, reputation, goodwill, and emotional well-being.

## IX.  COUNTS / CAUSES OF ACTION

**COUNT I – VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

Plaintiffs further allege that Defendants entered into, participated in, enforced, and benefited from a contract, combination, or conspiracy in restraint of trade by conditioning practical access to MLS-linked residential real-estate data and participation infrastructure on the compelled

94

purchase of bundled local, state, and national REALTOR® association memberships, together with related dues, fees, and obligations.

Plaintiffs further allege that Defendants' coordinated conduct includes, without limitation, the linked three-level membership requirement, refusal to offer neutral or standalone access to the MLS-linked product on commercially reasonable terms, coordinated enforcement of access restrictions, rule-based exclusionary practices, and the use of association-controlled rules and MLS-linked infrastructure to burden or foreclose professionals who seek to compete outside the challenged structure.

Plaintiffs further allege that the challenged restraint has caused and continues to cause antitrust injury by directly burdening Plaintiffs as immediate market participants, forcing tied purchases, restricting or threatening access to essential MLS-linked data and participation functions, impairing Plaintiffs' ability to compete on equal terms, reducing competition, consumer choice, transparency, and independent professional service options in the affected Louisiana residential real-estate markets, and causing injury to Plaintiffs' business and property, including lost opportunities, reduced competitive participation, loss of business, and damage to professional goodwill.

Plaintiffs further allege that Defendants' conduct constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

**COUNT II – VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. § 3601 et seq.)**

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

95

Plaintiffs further allege that Defendants' challenged rules, concealment practices, and MLS-linked access restraints materially reduce transparency in residential real-estate transactions, including by obscuring compensation-related information, restricting the visibility of information relevant to consumer decision-making, impairing the ability of professionals and consumers to detect steering or discriminatory treatment, and burdening the ability of independent professionals to compete using more open and transparent service models.

Plaintiffs further allege that the challenged conduct disproportionately burdens fair-housing compliance, impairs the practical ability to detect or document discriminatory patterns in residential brokerage activity, and creates conditions that can materially hinder equal housing opportunity and informed consumer choice in the affected residential real-estate markets.

Plaintiffs further allege that Defendants' conduct violates the Fair Housing Act.

## COUNT III – BREACH OF CONTRACT

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

Plaintiffs further allege that Plaintiffs, as members or former members of Defendant REALTOR® associations and/or users subject to Defendant-controlled membership and MLS-related terms, entered into contractual relationships with one or more Defendants through membership agreements, bylaws, rules, policies, fee schedules, published guidance, and related governing documents.

Plaintiffs further allege that Defendants breached those contractual obligations by, among other things, imposing and enforcing requirements and interpretations that exceeded actual state-law

requirements, disseminating materially inaccurate or misleading guidance concerning buyer representation agreement timing and related obligations, imposing fines or penalties based on those misstatements, and administering the membership-and-access structure in a manner inconsistent with Defendants' own governing materials, duties of good faith, and representations to members.

Plaintiffs further allege that Defendants' breaches caused Plaintiffs direct harm, including loss of business opportunities, coercive compliance pressure, exposure to penalties, disruption of professional judgment, injury to Plaintiffs' business and property, and reputational harm and loss of goodwill resulting from public confusion between licensed Louisiana real estate professionals and REALTOR® association members, damaging publicity, misleading public narratives, and the practical inability of many consumers to distinguish between Defendants' association-imposed rules and actual state-law requirements.

**COUNT IV – UNJUST ENRICHMENT**

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

Plaintiffs further allege that Defendants received and retained money, dues, fees, charges, and other benefits from Plaintiffs and similarly situated professionals through the challenged membership-and-access structure, including payments tied to compulsory or effectively compelled association memberships and MLS-linked charges.

Plaintiffs further allege that Defendants' retention of those benefits is unjust because the benefits were obtained and maintained through coercive tying, exclusionary conduct, misleading

97

representations, and the conditioning of practical access to essential MLS-linked data and participation infrastructure on unwanted bundled purchases and related obligations.

Plaintiffs further allege that equity and good conscience require restitution, disgorgement, or other equitable relief to prevent Defendants from retaining benefits unjustly obtained.

## COUNT V – LOUISIANA ANTITRUST / LOUISIANA MONOPOLIES ACT

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

Plaintiffs further allege that Defendants' coordinated tying arrangement, exclusionary conduct, and membership-conditioned control over practical access to MLS-linked residential real-estate data and participation infrastructure constitute unlawful restraints of trade, monopolistic or exclusionary practices, and anticompetitive conduct under Louisiana law, including the Louisiana Monopolies Act and related Louisiana antitrust principles.

Plaintiffs further allege that Defendants' conduct has materially restrained competition, burdened independent professionals, reduced consumer choice, distorted market transparency, and injured Plaintiffs in their business and property in Louisiana, including through lost business opportunities, reduced market participation, diminished competitive visibility, and damage to Plaintiffs' professional goodwill and business reputation.

98

**COUNT VI – CIVIL CONSPIRACY**

Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

Plaintiffs further allege that two or more Defendants agreed and acted in concert to implement, maintain, and enforce the challenged membership-and-access structure, related exclusionary rules, misleading communications, and coordinated policies designed to preserve control over MLS-linked data, participation rights, and downstream market access.

Plaintiffs further allege that Defendants' concerted acts were undertaken for the purpose of restraining competition, coercing compliance, excluding or burdening non-conforming professionals, preserving Defendants' control over concentrated local market inventory, historical data, sold-price information, showing-related functions, and other competitively necessary infrastructure, and disseminating or reinforcing false or misleading narratives concerning legal requirements and professional obligations.

Plaintiffs further allege that Plaintiffs suffered damages as a result of those concerted acts, including economic harm, loss of business opportunities, reduced ability to compete, reputational injury, and loss of professional goodwill.

**XII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

A. Declare that Defendants' challenged conduct, including the conditioning of practical access to MLS-linked residential real-estate data and participation infrastructure on compelled local, state, and national REALTOR® association memberships and related obligations, violates applicable federal and Louisiana law;

B. Award temporary, preliminary, and permanent injunctive relief prohibiting Defendants from conditioning practical access to MLS-linked residential real-estate data, participation rights, or related MLS-linked functions on compulsory association membership, and requiring Defendants to provide neutral, commercially reasonable, and nondiscriminatory access consistent with law;

C. Award Plaintiffs compensatory damages in an amount to be determined at trial for injury to Plaintiffs' business and property, including lost opportunities, coerced or threatened payments, impaired competition, reduced access, loss of business, reputational harm, loss of goodwill, and other damages permitted by law arising from Defendants' conduct;

D. Award treble damages where authorized by law on Plaintiffs' antitrust claims;

E. Award restitution, disgorgement, or other equitable monetary relief as permitted by law, including the return of monies wrongfully obtained through the challenged conduct;

F. Award Plaintiffs costs of court and, where authorized by statute or other applicable law, reasonable attorney's fees;

G. Award pre-judgment and post-judgment interest as permitted by law;

H. Award such other and further legal or equitable relief as the Court deems just and proper.

Authentisign ID: E1A6C5F0-C93D-F111-8EF2-000D3A55CAFE

Award Plaintiffs damages in an amount not less than Ten Million Dollars ($10,000,000.00), or such greater amount as may be proven at trial, together with treble damages to the extent permitted by law, plus costs, interest, and all further relief the Court deems just and proper.

XIII. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

04/21/2026

Pro Se Plaintiffs

Carla DeYoung

*Carla DeYoung*    04/21/26

Darlene Currie

*Darlene Currie*    04/21/26

Tammy Jo Williams

*Tammy Jo Williams*    04/21/26

Carlos Alvarez

*Carlos Alvarez*    04/21/26

101